CONSTRUCTION ASSOCIATES, INC.,
Appellant (Plaintiff Below),

v.

PERU COMMUNITY SCHOOL BUILD-
ING CORPORATION, Peru Community
School Corporation, and Wabash Valley
Bank and Trust Company, Trustee, Ap-
pellees (Defendants Below).

No. 3–177A25.

Court of Appeals of Indiana,
Third District.

Aug. 29, 1979.

Rehearing Denied Oct. 3, 1979.

Alan H. Goldstein, Indianapolis, for ap-
pellant.

Robert D. Haig, James A. Berkshire, Keith, Berkshire & Keith, Peru, for appellees.

STATON, Judge.

Construction Associates, Inc., the general contractor for the construction of the Peru Senior High School, filed its complaint against the Peru Community School Corporation and the Peru Community School Building Corporation (hereinafter collectively referred to as "Peru") to recover: (1) the retainage on the project, including $20,000 for having substantially completed construction on time; (2) damages incurred by Construction Associates as a result of delays allegedly caused by Peru; (3) additional compensation for unit price work. Peru counterclaimed for damages attributable to Construction Associates' alleged delay in completing the project.

The trial court awarded Construction Associates retainage in the amount of $48,740.99, which amount was offset by an award to Peru of liquidated damages in the sum of $5,423.04. The trial court denied the other claims, including the $20,000 claim for substantial completion.

On appeal, Construction Associates challenges the denial of its claims and the award of liquidated damages.

We affirm in part and reverse and remand in part.

## I.

### Substantial Completion

The bid form provided by Peru requested Construction Associates to submit a bid on the total contract price based upon Construction Associates' estimate of the time required for substantial completion. In addition, Construction Associates was required to submit a bid as to the additional costs it would incur in order to meet an earlier completion date (subsequently designated in the contract as December 1, 1970). Construction Associates submitted a base bid of $2,602,350 and to the base bid added $20,000 for substantial completion by December 1, 1970. Peru accepted those bids.

The bid documents and the contract made it clear, however, that the early completion date set forth in the contract was not absolute. Rather, it was subject to extensions of time. The bid form provided:

"All guaranteed completion requirements set forth in the foregoing are subject to the provisions of Article 18 of the General Conditions of Contract, in connection with 'Delays and Extensions of time.'"

Article 18 of the General Conditions of Contract read as follows:

"*DELAYS AND EXTENSIONS OF TIME*

Should the contractor be delayed in the execution of the work at any time as a result of any neglect or act of the Architect or Owner,[1] or by any representative or employee of either, or by any contractor under separate contract with the Owner, or by change orders, or caused by unforseeable [sic] circumstances not the fault or negligence of the contractor, or by causes beyond his control, including but not restricted to acts of God, or the Public enemy, Acts of Government, fires, floods, epidemics, quarantine restrictions, unavoidable casualties, labor disputes, strikes, freight embargoes, unusual delays in transportation, unusually severe weather or delays in the work of subcontractors due to such causes, or by delay authorized by the Architect pending arbitration, or by any cause which the Architect shall decide justifies such delay, then the time of completion shall be extended by such reasonable time as the Architect may decide."

The architect did allow an extension of 43 working days for delays caused by unusually severe weather, thus extending the early completion date to February 1, 1971. Substantial completion was not effected by that date. Hence, the trial court's denial of

---

1. In the contract and in the trial court's findings of fact, which are quoted extensively on the following pages, Peru is referred to as "the Owner" and Construction Associates is referred to as "the Contractor".

Construction Associates' $20,000 claim for early completion.

Construction Associates contends that there were several delays other than those for which the architect granted extensions which fell within the purview of Article 18 and which mandated further extensions of time.

Several of the trial court's findings support that contention:

"6. The Bid Form provided by the Owners to the Contractor requested the Contractor to submit a lump sum proposal for completion of the work based on Contractor's estimate of the time required to complete such project. In addition, the Contractor was required to submit a bid as to the additional costs it would incur in order to meet an early completion date as specified by the Owners. For the latter purpose, the Contractor bid the amount of Twenty Thousand Dollars ($20,000.00) as such additional costs for guaranteed early completion. In making such estimates, the Contractor was justified in relying upon and did rely upon the provisions of Addendum # 2 which included a map of soil test boring and the following language:

'All bidders are also informed that the rock level shown on the revised contour map, and on the original drawings, represents the surface of limestone which is extremely weathered and easily removed. In all cases, it is assumed that this rock will be able to be removed with the use of power equipment, such as, backhoes, dozers, and the like. All contractors are to base their bids on this premise.'

*　　*　　*　　*　　*　　*

"17. Based on Article 38, Section 3 of the General Conditions of Contract, the court finds that Ronald H. Fanning and the firm of Fanning & Howey, were, in their capacities as architect, the agent and representative of the Owners, and the court further finds that the Owners were responsible and are bound by the acts and omissions of Ronald H. Fanning and the firm of Fanning & Howey as set forth in the Contract.

*　　*　　*　　*　　*　　*

"20. Under terms of the General Conditions of Contract, Article 51, p. 48, the Owner was to 'establish the lot line, restrictions, and at least one usable benchmark.' The benchmark so required to be provided by the Owner was the prime measurement from which and upon which all other elevations on the project were to be drawn or based. Such benchmark is sighted on a stationary object and is given as a precise elevation above sea level.

"21. The original benchmark was specified by the architect in Job Report No. 1 under date of January 17, 1969. (See Plt's. Ex. 7) While Contractor proceeded to prepare a site layout and grade lines based on that benchmark, one month later, on February 26, 1969, the architect advised that the original benchmark was in error and established a new benchmark as set forth in Job Inspection Report No. 9 (Plt's. Ex. 8) On March 4, 1969, the architect again determined that the benchmark was in error and directed all contractors to ignore previous benchmarks and to use a newly established benchmark. (See Job Visit 10, Plt's. Ex. 10)

"22. The drawings and plans provided by the architect disclosed that a 16″ water main traversed the project site, but failed to disclose that it was located upon and around hard rock rather than soft weathered limestone as represented by the architect in the Bid Documents. The main was also closer to the surface than shown by the plans and drawings failed to disclose that the main was constructed with leaded joints rather than modern mechanical joints making it extremely susceptible to damage and rupture during any heaving grading operations. (Plt's. Ex. 11)

"23. Plaintiff's Exhibit 12 sets forth the actual elevation of the subsurface rock at the various locations in which the test borings were made. The evidence shows that the subsurface rock was three to four feet higher than shown on the contour drawings.

"24. In addition to the higher level of rock, the rock which was below the surface of the project site also proved to be extremely hard, solid rock and medium hard rock contrary to representations made in

Addendum 2 prepared by the architect to the bid document package. Addendum No. 2 advised contractors bidding the project that rock removal on the project presented no particular problem since the rock was 'extremely weathered and easily removed.' (Plt's. Ex. 1, Addendum No. 2, page 1)

"25. Cass County Stone Corp., the subcontractor for the excavation of the stone, and Gale Smith Excavation Co., the subcontractor for the site work, each immediately advised the Contractor that additional costs would be incurred and each submitted a request to the Contractor for an extension of eight to ten weeks for completion of their work. (Plt's. Ex. 14, 15) Contractor similarly advised the architect of the additional costs and the need for additional time and requested an extension of ninety days. (Plt's. Ex. 13) The architect refused to give consideration to the request for extension of time.

\* \* \* \* \* \*

"30. In addition to the removal of considerable additional subsurface rock, the actual contours of the subsurface rock made it necessary for the architect to raise the elevation of Building A of the project two feet. (See Plt's. Ex. 17, Job Visit 15) This meant the changes had to be made in the plans to raise all the elements of the foundations from the floor slab below ground, sewer lines, footings and caissons some two feet higher than originally planned. This change in design required the Contractor to bring in additional gravel fill. In addition, changes had to be made in the design of the caissons and footings for the foundation. Reinforcing rods and steel which had been fabricated in accordance with the original plans and were in transit to the site had to be reworked and refabricated by the Contractor in the field to fit the newly designed footings and caissons. Reinforcing steel which was in the process of fabrication by U.S. Steel Supply and International Steel Company had to be redetailed because of the extensive revisions in the caissons, resulting in further delays in fabrication and shipment of steel to the project. (Plt's. Ex. 21, 22) In view of the cumulative effect of

these delays on job progress, on August 14, 1969, Contractor requested an additional ninety days extension of time for completion. (Plt's. Ex. 28.) The architect again refused the request for extension of time.

\* \* \* \* \* \*

"32. By letter dated November 19, 1969, Contractor was advised by Cass County Stone Corp., the subcontractor for installation of driveways and parking lots on the project, of the delays and increased costs being incurred by it. (Plt's. Ex. 32.) Repeated changes had been made by the architect in the original design for the grading for roads and driveways with supposedly final drawings issued on June 9, 1969. (Ibid.) Even after approval by the Owners of the increased costs represented by those 'final' design changes, further revisions were thereafter made by the architect. The architect was still proceeding on a trial and error basis, and at no time issued a comprehensive drawing of the site grades for the excavating and grading subcontractors.

\* \* \* \* \* \*

"34. The delays in the completion of the site grading further delayed the project by affecting the contractor's ability to supervise the work of its own forces and of its subcontractors and trades who were working in extremely adverse conditions, attempting to deliver materials, park their automobiles and proceed with the work in muddy areas without the benefit of hard surface driveways and parking lots which had been scheduled for completion in June of 1969 (Plt's. Ex. 6) but which were not completed until mid-1970.

"35. In addition to the problems incurred because of the preparation and grading of the site, the project was further delayed due to the failure of the city of Peru to provide electrical power to the project. In Job Visit 131, dated June 15, 1970, it was reported b- [sic] the architect that the municipal utilities were failing to cooperate in providing such power (Plt's. Ex. 36) and that such lack of cooperation could further delay the completion of the project. It was critical at the time of that

report to get electricity to the job site in order to allow the electrical contractor to check and test that equipment which would be needed for heat later in the fall and winter months.

"36. Because of this lack of power, the interior trades were unable to proceed with their work inside the enclosed structure. In its Job Visit Report 161, dated November 9, 1970, the architect recommended to various trades that they perform that work which would not be affected by temperatures in the building. (Plt's. Ex. 39.) In the report of Job Visit 162, November 16, 1970, it was further noted by the architect that, as of that date, floor finishing and painting had to be discontinued due to the low inside temperatures. (Plt's. Ex. 40.) On November 17, 1970, Contractor directed a letter to the architect that, because of the sweat and moisture on the halls due to the cold inside temperatures, Contractor would have to halt installation of wall vinyl covering until power was supplied and . . .

"37. . . . There was even a further delay of approximately two additional weeks due to the failure of the mechanical contractor, who had a direct separate contract with the Owners, to provide the sheet metal duct work for the purpose of providing heat to the gymnasium area of the project. (Plt's. Ex. 44.) It was noted in the architect's report of Job Visit 168 (Plt's. Ex. 44) that such heating units were needed to be in operation before the gymnasium floor could be laid by the contractor.

"38. The impact of the initial delays on the project due to the site problems encountered required much of the work on the project to be rescheduled and performed during winter months. This forced further delays in completion of the enclosure of the project during the winter months and a further impact on the scheduling and progressing of the interior work of the project which could not continue until the building was completely enclosed."

Nevertheless, the trial court, concluded:

"41. As previously stated in Finding # 15 herein, the Court finds that there were delays, and the Court further finds that said delays were caused through no fault of either the owner or his agent."

■ Construction Associates predicates its claim for the early completion payment on the contention that Finding # 41 is erroneous. Because Construction Associates had the burden of proof on their claim for the $20,000 and the trial court concluded it was not entitled to the payment, Construction Associates is appealing from a negative judgment. Accordingly, the appropriate standard of review of the finding is the "clearly erroneous" standard set forth in Ind. Rules of Procedure, Trial Rule 52(A). *Alfaro v. Stauffer Chem. Co.* (1977), Ind. App., 362 N.E.2d 500.

■ It is apparent that Finding # 41 is inconsistent with the other findings of the trial court. Furthermore, after having examined the record, we conclude that Finding # 41 is clearly erroneous. The record shows that the delays referred to in the findings are delays which fall within the scope of Article 18. The architect should have granted additional extensions of time.[2]

■ We are unable to determine from the record, however, the length of the extensions to which Construction Associates is entitled. That is, instead, a function for the trial court. Accordingly, the cause is remanded to the trial court for proceedings to determine the length of the extensions to which Construction Associates is entitled and to ascertain from that determination whether Construction Associates is entitled to the early completion payment.

## II.

### Liquidated Damages

The contract further provided that in the event the project was not substantially completed before the "early substantial completion date" discussed in Section I of

---

2. Peru directs our attention to portions of the record which indicate that Construction Associates was responsible for other delays. Con-

struction Associates' responsibility for delays, however, is not in issue. The issue is whether there were delays attributable to Peru.

this opinion, not only would Construction Associates not receive the $20,000 "bonus", but, in addition, Peru would be entitled to liquidated damages. The amount of the liquidated damages would depend primarily upon the number of days separating the "early substantial completion date" from the actual substantial completion date.

In arriving at its conclusion that Peru was entitled to liquidated damages, the trial court used February 1, 1971 as the "early substantial completion date". As indicated in the previous section, Construction Associates was entitled to an extension of that date because of delays attributable to Peru.

On remand, the trial court is instructed to recompute the amount of liquidated damages to which Peru is entitled, if any, based upon the trial court's corrected "early substantial completion date".

## III.

### Damages Caused by Peru's Delays

Construction Associates contends that it incurred additional expenses as a direct result of delays attributable to Peru. It further contends that it is entitled to recover those costs from Peru.[3] Because the trial court concluded that there were no delays attributable to Peru, it did not address this particular issue. As previously noted, however, the trial court's conclusion is clearly erroneous. Therefore, on remand the trial court must also determine the amount of damages, if any, incurred by Construction Associates as a result of the delays attributable to Peru.

## IV.

### Additional Compensation for Extra Work

■■ As a result of changes in the site and grading plans, the project necessitated more fill material than was contemplated at the inception of the contract. The parties had anticipated the possibility that addi-

tional work might be required and, accordingly, the contract provided a method for determining the amount Construction Associates would be paid for that work. Pursuant to that provision, Construction Associates was to be paid $5.00 for each additional cubic yard of fill material that it provided. Prior to the performance of the additional work, however, Peru informed Construction Associates that it would pay only $3.50 for each additional cubic yard. Construction Associates signed a change order agreeing to that price.[4]

Construction Associates argues that the original contract prices, rather than the prices indicated by the change orders, are controlling because: (1) the change orders were signed under duress; and (2) the change orders were not supported by consideration.

As to Construction Associates' claim of duress, the trial court found that the change orders were voluntarily signed. A review of the record supports the trial court's finding.

Inasmuch as failure of consideration is an affirmative defense, Construction Associates had the burden of proof on that matter. TR. 8(C). The trial court made no finding on the question of consideration. Under former law, in such an instance we could imply a finding against Construction Associates. *See Metrailer v. Bishop* (1959), 130 Ind.App. 77, 162 N.E.2d 94. However, such implications are now proscribed by TR. 52(D). Accordingly, on remand the trial court is instructed to make a finding as to whether the change orders were supported by consideration.

The cause is remanded to the trial court for proceedings consistent with this opinion.

HOFFMAN, J., concurs.

GARRARD, P. J., concurs in result.

---

**3.** Peru does not challenge the theory of recovery.

**4.** The project also required additional excavation work. Construction Associates signed change orders for that work, too. Those change orders also resulted in lower unit prices.