**Stanley G. MORTON and Martin Paligraf, Appellants,**

v.

**E–Z RAKE, INC., Appellee.**

**No. 2–178A15.**

Court of Appeals of Indiana, Fourth District.

Nov. 20, 1979.

Rehearing Denied Feb. 20, 1980.

Peter L. Obremskey and Charles W. Ritz, III, Parr, Richey, Obremskey & Morton, Lebanon, for appellants.

Good & Murphy, Shelbyville, for appellee.

MILLER, Presiding Judge.

On February 15, 1975, Morton and Paligraf, Plaintiffs-Appellants were discharged from E–Z Rake, Inc., Defendant-Appellee by Bob Good, a practicing attorney, acting in his capacity as Vice President and Secretary of E–Z Rake. Both Morton and Paligraf filed complaints in the Boone Superior Court on June 13, 1975, Paligraf alleging wrongful discharge and both seeking compensation and benefits. After a bench trial of the consolidated causes, judgment was entered for E–Z Rake on July 18, 1977. A proper appeal was taken from that judgment.

The issues on appeal are:

1. Was Paligraf wrongfully discharged?
2. Did the trial court err in failing to grant Paligraf a pro-rata portion of the compensation in his employment contract based upon corporate profits from the beginning of the corporate year until the date of his termination?
3. Was Morton entitled to severance and vacation pay?

We affirm in part and reverse in part.

We first note the following pertinent facts:

*June 1, 1971.* Paligraf was promoted pursuant to the following employment contract which was drafted by Good:

THIS AGREEMENT made and entered into this 1st day of June, 1971, by and between E–Z RAKE, INC., hereinafter referred to as 'First Party', and MARTIN PALIGRAF, hereinafter referred to as the 'Second Party', WITNESSETH THAT:

(1) The First Party hereby employs the Second Party as Executive Vice-President for a term of five (5) years, commencing June 1, 1971, and terminating May 31, 1976.

(2) First Party promises and agrees to pay to the Second Party as and for his services in such capacity, the sum of Two Thousand Dollars ($2,000.00) per month, plus ten percent (10%) of the annual net profits of the corporation before taxes.

(3) Second Party promises and agrees to devote his full reasonable working time in the performance of his duties, all under the supervision of the officers and Board of Directors of the First Party, and to perform his duties at all times in a good and workmanlike manner.

Dated: June 1, 1971.

E–Z RAKE, INC.

BY /s/ Alice C. Carrigan

Alice Carrigan, President

FIRST PARTY

/s/ Martin Paligraf

Martin Paligraf

SECOND PARTY

Although his title was "Executive Vice President," he performed the duties more commonly attributed to the title "General Manager."

*August, 1972.* Paligraf hired Stanley Morton as "Plant Manager." No written contract formed the basis for this employment.

*January, 1975.* Malcolm Dick and Joe Hasty (employees) filed grievances with the union in accordance with normal grievance procedure because they were not paid for a fifteen minute break after which Dick left on personal business and for a thirty-three minute period during which time Hasty had to take his wife home due to illness.

*January 30, 1975.* Stanley Morton was informed of the grievance and in response sent a letter to the aggrieved employees and copies to the union representative denying them their claim for pay during the periods.

*February 10, 1975.* Good wrote to Morton telling him to pay both employees for the claimed periods.

*February 12, 1975.* In response to Good's letter, Morton wrote to Good arguing that payment of the claims was against established company policy and refused to pay either employee.

*February 14, 1975.* Good placed a call to Morton and Paligraf simultaneously. The following was taken from a recording of that conversation.

. . . . .

GOOD: Now the matter of the fifteen minutes or thirty minutes is no longer important. The important thing is that you have refused to obey a direct order from the Vice-President and from the Board of Directors. This you are not going to do. Now, I will tell you again that you are to comply with the instruction just as I sent it up there to you Mr. Morton. And Mr. Paligraf, I now tell you that that is what you are to implement, and if you refuse to do it, you will get the consequences.

. . . . .

GOOD: . . . I'm telling you that if you get an order from one of the officers or from the Board to do something, that you are required to do it.

. . . . .

GOOD: . . . Now, I'm telling you, Mr. Paligraf, that you are to see that he makes those payments to Mr. Hasty and that other fellow.

PALIGRAF: I will not pay Joe Hasty for thirty minutes work.

GOOD: Alright. Then you are now fired, and you, Mr. Morton, I'll tell you frankly, we consider that you are oper-

ating under Mr. Paligraf's orders rather than your own.

MORTON: Well, that letter was mine.

GOOD: Alright. I consider it that way, but they may be willing to talk to you further, but you are either going to do what you're told to do by the officers or the Board, or you're not going to be there. And I'll tell you something else, Paligraf, if you'll read your little contract, you'll find that that's exactly what it says, that if you don't obey the orders as you have now refused to do, your contract is void.

. . . . .

GOOD: Okay. Now you are now fired. You're both now fired. Period. As of right now.

. . . . .

A second telephone conversation took place between Good and Paligraf that day:

. . . . .

GOOD: I've talked to Mrs. Carrigan. .

PALIGRAF: Mm-huh.

GOOD: The situation still stands. You are both out. We'll take the matter up at the meeting in Las Vegas. You and Stanley are both authorized to come at the company expense. In the meanwhile, Ron Bade is the acting General Manager, and Bob Hasty is the acting Plant Manager.

*February 14, 1975.* The telephone conversations were followed by letters to Morton and Paligraf confirming that they were both fired but authorized to attend the Board Meeting in Las Vegas at company expense.

*February 23, 1975.* The regularly scheduled (every 60 days) Board of Directors Meeting for E–Z Rake was held. All directors, including Mrs. Carrigan, Mrs. Jones, Mrs. Harvey and Mr. Good, were in attendance. The minutes reflect that:

[B]y unanimous vote, the Board confirmed the appointments of Ron Bade as General Manager and Bob Hasty as Plant Manager. Mr. Bade was instructed to report to the Board at its next meeting

about personnel requirements that might be occasioned because of recent changes.

## I. Wrongful Discharge

### A. Authority

Morton and Paligraf contend Good did not have the authority to discharge them claiming such was a non-delegable duty of the Board of Directors. In support of this proposition, they cite *Ind.Code* 23–1–2–13:

All officers and agents of the corporation as between themselves and the corporation shall have such authority and perform such duties in the management of the property and affairs of the corporation as may be provided in the by-laws, or, in the absence of such provision, as may be determined by resolution of the board of directors.

and Art. IV § 2 of E–Z Rake's By-Laws:

Corporate powers shall be vested in the Board of Directors who shall have the management and control of the business of the corporation. They shall employ such agents and service as they deem advisable, . . . .

We disagree.

■ Although a board of directors may be charged with the control and management of the corporate business, it may nonetheless invest its officers with authority to act for the corporation by resolution, course of dealing, acquiescence, or ratification. ·6 *I.L.E. Corporations* § 142 (1958). *See, Crowe v. Gary State Bank* (7th Cir. 1941) 123 F.2d 513, 516.

■ Even if Good did not have the authority to fire Morton and Paligraf on February 14, 1975, there is evidence in the record which supports a conclusion that the Board of Directors ratified Good's actions. This determination is a question of fact to be determined by the trial court and can be inferred from acts, words and the ordinary course of dealing. *State ex rel. Guaranty Building & Loan Co. v. Wiley* (1935), 100 Ind.App. 438, 196 N.E. 153.

The Board's February 23, 1975, minutes show the directors unanimously confirmed the appointments of Morton and Paligraf's successors. This is sufficient evidence to support the trial court's judgment in this regard. *See State ex rel. Crooke v. Lugar,* (1976) Ind.App., 354 N.E.2d 755.

### B. Justification for Termination

 Appellants Morton and Paligraf argue their termination was not for good cause because the rules of the organization were not made known to them and further because the instructions were given in an abusive manner. This, again, was a question for the trier of fact to resolve. An examination of the record, including the telephone conversations, reveal there was sufficient evidence to support the trial court's conclusion that Morton and Paligraf were terminated for good cause, that is, their refusal to obey an order from the Vice-President given in a direct manner. 12 *I.L.E. Employment* § 12 (1959).

### II. Paligraf's entitlement to a share in E–Z Rake's 1975 profits

Paligraf's employment contract sets out his compensation as:

[T]he sum of Two Thousand Dollars ($2,000.00) per month, plus ten per cent (10%) of the annual net profits of the corporation before taxes.

Paligraf contends he was entitled to a pro rata payment of his ten percent share of the profits for the period June 1, 1974, to February 14, 1975, (the fiscal year ran from June 1 to May 31). E–Z Rake contends all Paligraf's rights to a share in the profits were forfeited as he was discharged for cause.

 With respect to the compensation provisions of the contract, we first note there is no language which anticipates the termination of Paligraf's employment for any reason, voluntary or involuntary. Second, the contract was prepared by Good, an attorney, as the representative of E–Z Rake. Therefore, any needed construction of its terms should be favorable to Paligraf. *Colonial Mortgage Co. of Indiana, Inc. v.*

*Windmiller,* (1978) Ind.App., 376 N.E.2d 529; *Mandle v. Owens,* (1975) Ind.App., 330 N.E.2d 362. Finally, the language does not suggest the ten percent increment is, as E–Z Rake insists, a "bonus," that is, merely a gratuity for which Morton had no right to make a demand. *See Walling v. Plymouth Mfg. Corporation,* (7th Cir. 1944) 139 F.2d 178 cert. den. 322 U.S. 741, 64 S.Ct. 1144, 88 L.Ed. 1574. It appears to us the language of the contract is clear and the ten percent increment, although it might loosely be termed a bonus or incentive plan, was as much a part of Paligraf's compensation as was the fixed amount of $2,000.00 per month.

In *Flynn v. Koppers Company, Inc.* (7th Cir. 1977) 567 F.2d 741, the Court applied Indiana law to a situation in which Plaintiff Flynn was to receive extra compensation under an incentive plan. The employment contract read in part:

This plan is effective for the period commencing January 1, 1973 and ending December 31, 1973. Amount earned under this plan will become payable as soon as possible after the Company's books have been closed for the year 1973. If you do not remain in your present position throughout the year, your incentive arrangement may be adjusted or terminated.

Flynn voluntarily terminated his employment before the end of 1973. The Court interpreted the meaning of the contract as follows:

[T]he bonus plan offered by an employer normally becomes binding as a unilateral contract when the employee begins performance of the terms of the proposed plan in the sense that the plan cannot be revoked by the employer unless the plan specifies, as in that case, some particular condition to be met.

. . . . .

The company would have us reform the contract it supplied its employees so that the provision which provides that amounts earned will become payable as soon as possible after the company's

books are closed for the year, would read that the employee to be eligible to receive the payment must be on the payroll at the end of the year. The company argues that the company's promise to pay the bonus is in consideration of the employees remaining in the employment and rendering service for the full year. Nowhere does the plan say that. It says instead that it is in recognition of incentive performance in achieving and bettering quotas and recognizes the individual's contribution to the overall performance of the division. Those objectives do not require that an employee employed for an indefinite period work for a definite period in order to exceed the quotas and to benefit the company. The objectives might be accomplished in a day. The company seeks to keep to itself all the benefits its plan generated which were intended to be shared with its employees.

The company would also have us reform its contract provision which provides that if the employee does not remain in his present position throughout the year, the employee's incentive arrangement may be adjusted or terminated. That provision would then read that if the employee does not remain in the company employment the entire year, the extra compensation he has already earned to date is forfeited. The term "forfeit" appears nowhere in the plan. . . . If the contract was intended to say what the company now argues it says, we believe the company could very easily and clearly have written its contract to reflect that view. *Id.* at 743.

The reasoning in *Flynn, supra,* is applicable to the case before us. Had E–Z Rake intended to limit the profit-sharing portion of Paligraf's compensation in the manner it now presents, the necessary provision could have easily been placed in the contract. Paligraf's full ten percent share in the profits for the fiscal year 1975 would have been $36,596.67. His pro rata share for the time of employment during that fiscal year was $25,968.12. It is not contested that Paligraf was entitled to his fixed salary of $2,000.00 per month to the date of his termination.

He was equally entitled to his pro rata share of the profits.

■ Paligraf appeals from a negative judgment and such a judgment can only be reversed if clearly erroneous. *Alfaro v. Stauffer Chemical Co.,* (1977), Ind.App., 362 N.E.2d 500, *Construction Associates, Inc. v. Peru Community School Building Corporation,* (1979) Ind.App., 393 N.E.2d 792. We conclude the trial court's interpretation of the employment contract was clearly erroneous and Paligraf should have been granted judgment in the amount of $25,968.12.

### III. Morton's Right to Benefits

■ Morton contends he should have recovered accrued vacation pay and severance pay. He does not argue wrongful discharge since his employment was terminable at will. Nor does he argue that these rights were provided in an employment contract since he worked pursuant to an oral agreement. However, he contends he proved his entitlement to these benefits through E–Z Rake's past dealings, a quasi-contractual or estoppel theory. E–Z Rake denies the evidence presented was applicable to Morton's situation.

The only evidence relating to severance pay was that a salesman who had been discharged received a sum of money. This is characterized by Morton as "severance pay" and by E–Z Rake as "commission due on sales" in his territory. Concerning vacation pay, it was shown Morton had six weeks unused vacation over his two and one-half year period of employment. However, there was no evidence presented as to whether this time could be accrued over the years and payment therefore made upon termination. The evidence on these issues was in conflict and we will not disturb the result reached by the trial court. *Clark Advertising Agcy. v. Avco Broadcasting,* (1978) Ind.App., 383 N.E.2d 353.

This cause is remanded with instructions to award Paligraf damages in the amount of $25,968.12. In all other things, the judgment is affirmed.

Judgment affirmed.

CHIPMAN, J., concurs.

YOUNG, J., concurs.