Gary D. ROSS, Plaintiff-Appellant,

v.

Milton H. TAVEL, Charles J. Lawson, National Alarm Corp., National Energy Systems, Inc., and Natron Corp., Defendants-Appellees.

No. 2–980A312.

Court of Appeals of Indiana, First District.

March 30, 1981.

Rehearing Denied May 4, 1981.

Sidney Mishkin and R. Davy Eaglesfield, III, Mishkin, Eaglesfield, Darst & Grossman, Indianapolis, for plaintiff-appellant.

Irving L. Fink, Indianapolis, for defendants-appellees Milton H. Tavel, Charles J. Lawson and National Energy Systems, Inc.

Alan H. Lobley, Ice, Miller, Donadio & Ryan, Indianapolis, for defendants-appellees Natron Corp. and National Alarm Corp.

RATLIFF, Judge.

## STATEMENT OF THE CASE

Gary D. Ross, plaintiff below, appeals from a negative judgment on his wage and minority shareholder claims against Natron Corp., National Energy Systems, Inc., National Alarm Corp., Milton H. Tavel, and Charles J. Lawson. Neither Ross nor appellees challenge the trial court's award of $1,643.79 in Ross's favor for expenses which Ross incurred while rendering repairs to former customers of Natron Corp. Likewise, Natron Corp. does not challenge the court's judgment in favor of Ross on the counterclaim it brought against him for mismanagement. We affirm.

## FACTS

The findings of fact and conclusions of law from which the appeal is taken were set forth by the trial court as follows:

### "FINDINGS OF FACT AND CONCLUSIONS OF LAW

"This case came on for trial on February 28, 1980; evidence was heard and the case continued to March 5, 1980 at which time evidence was concluded and all parties rested. The court having considered the evidence now makes the following

### "FINDINGS OF FACT

"1. In April, 1977, Gary D. Ross, Milton H. Tavel and Charles J. Lawson formed Natron Corp., an Indiana corporation, to engage in the insulation business in Indianapolis, Indiana. Ross, Tavel and Lawson were the officers and directors of Natron, and Ross served as President and General Manager. Natron elected to be taxed as a Subchapter S corporation and its fiscal year was adopted for May 1 through April 30th.

"2. Tavel, prior to the formation of Natron, made a commitment to Ross that National Alarm Corp. of which Tavel and Lawson were sole shareholders, would loan Natron up to $50,000.00 to help finance Natron's operations.

"3. Ross wanted one-third of the stock in Natron, but acting on the advice of Tavel's accountant, it was agreed that Ross would get only twenty percent of the stock, but would receive one-third of the profits. Ross was also to be paid a salary of $700.00 per week and have the free use of an automobile. Lawson had 16% of the stock and the three Tavel children held the remaining 64%.

"4. National Alarm Corp. made loans to Natron which reached a high of $68,000.00 which loans were reflected in the monthly operating statements of Natron to which Ross had access. Ross signed checks on behalf of Natron making payments on said loans to National Alarm Corp.

"5. Ross' employment agreement was modified when Natron subsequently went into the siding business, giving Ross a special override on the siding business which increased his weekly salary in 1978 to an average of $788.00 per week.

"6. Ross, Tavel and Lawson agreed that Natron needed larger facilities for its operations in Indianapolis and decided to purchase a building at 3517 E. Michigan Street, Indianapolis, Indiana. On the advice of Natron's accountant, a separate corporation, National Energy Systems, Inc., was formed for the purpose of buying the real estate. The stock ownership

in National Energy was the same as Natron, but the certificates of stock were not formally issued until after the parties agreed on a change of percentage ownership in April, 1978, before the end of the fiscal year.

"7. National Energy Systems, Inc. purchased the real estate in December, 1977 for $92,650.00 and financed the purchase by an interest-free loan from Natron in the amount of $9500.00 and a mortgage for $85,000.00 from Merchants Bank and Trust Company which Tavel personally had to guarantee.

"8. Prior to the purchase of the 3517 E. Michigan Street property, the parties were aware of the fact that the boiler and heating system would require extensive repairs, that the roof leaked and that extensive remodeling would be required to meet Natron's needs. Natron leased the property from National Energy under a five year net lease agreeing to pay all taxes and insurance and agreeing to make all repairs plus paying a rental of $2,000.00 per month, although the fair market rental was $1,200.00 per month. Natron spent over $14,000.00 in making capital improvements to the National Energy building, including a boiler repair bill of over $4,000.00. Natron and National Energy never dealt with each other on a[n] arms length basis since National Energy was a vehicle to transfer profits from Natron for tax purposes. The stockholders recognized this and had no objection since the interest of the stockholders in both corporations was the same.

"9. Ross had complained on a number of occasions about the fact that he had only 20% of the stock in Natron and National Energy, and claimed that inasmuch as the profits of Natron in which he had a one-third interest, were being used to accumulate assets and were being siphoned off to National Energy, that he should be entitled to one-third of the stock in both corporations.

"10. A meeting was held on or about April 17, 1978, at which it was agreed that Ross' prior employment agreement would again be modified by increasing his stock in both corporations from 20% to 33% and the shareholdings of the Tavel children reduced accordingly. At the time of the April meeting, the March 31, 1978 financial statement of Natron showed total assets of $248,959.86 and a gross profit of $49,922.92.

"11. Harry Higgins, bookkeeper of National Alarm at Tavel's direction following the meeting, sent a letter under date of April 18 to Irving L. Fink, counsel for Natron and National Energy, notifying him of the agreement reached at the April meeting. Irwin Katz, Natron's accountant, who attended the April meeting, acted upon the agreement reached therein and thereafter prepared tax returns for Natron which were filed and which reflected the agreement increasing Ross' stock interest to 33%.

"12. Natron lost money in May and appeared to be losing money in June. Tavel was also dissatisfied with Ross' management of the business and did not desire to continue to be associated with him. Therefore, at a meeting in June of 1978, it was agreed to terminate the business, and liquidate the two corporations. At this time Tavel said Ross could have a 1973 truck and certain installation equipment for his assistance in liquidating the corporations if National Alarm received from Natron all of the money it had loaned Natron for working capital. Ross, however, was to be paid his expenses in correcting complaints on jobs completed. Ross then went into business for himself as Ross Industries as a home improvement contractor. Ross did cooperate and while Natron did pay Ross for some of his repairs, it is presently indebted to Ross for $1,643.79 for such repairs.

"13. The building owned by National Energy was sold for $140,000.00. It became apparent that there would not be sufficient funds realized upon liquidation of Natron to pay all of its creditors. At this time, Tavel and Ross had become quite hostile. In order to transfer part of the profit on the sale of the building to

Natron for the payments of its debts, a special meeting of the directors and shareholders of both corporations was held on September 6, 1978. At these meetings National Energy authorized the payment of $30,000.00 to Natron in exchange for the cancellation of its lease with National Energy so that National Energy could give possession to the purchaser in accordance with the contract of sale. The authorized transfer was made and all of the creditors of Natron, including National Alarm Corp. have been paid in full.

and upon such findings makes the following

## "CONCLUSIONS OF LAW

"1. The law is with the plaintiff and against Natron Corp. on its indebtedness to Ross in the sum of $1,643.79.

"2. The law is with the defendants and against the plaintiff on the balance of the issues raised by plaintiff's complaint and defendants' answer.

"3. The law is with the plaintiff and against the defendant on the issues raised by defendant Natron Corp.'s counterclaim.

"4. Ross' claim for profits from Natron Corp. must fail because he agreed to increase his share of the stock in the corporation from 20% to one-third in lieu of receiving the difference between 20% and one-third of the profits by some means other than accumulation of profits in the capital of the corporation.

"5. Ross' claim with respect to the transfer of the $30,000.00 to Natron by National Energy must fail because that portion of his claim is an action in equity on behalf of National Energy. While such transaction might be subject to attack if the shareholders in each corporation were not the same and if the shareholders had not all acquiesced in the failure of the two corporations to deal with each other in an arms length manner, it

cannot be so attacked here by a shareholder who acquiesced in this relationship. Equity will not intervene under these circumstances where the relief sought would result in an abuse of the equitable remedy. As between the shareholders, they all treated the two corporations as one. Because of this, Ross cannot now complain that in the liquidation Tavel and Lawson continued to treat them as such. Moreover, Ross' acceptance without payment of the 1973 truck and other equipment constituted an agreement to allow such action as might have been necessary to pay the creditors of Natron Corp. including National Alarm.

"6. Judgment should be entered in Ross' favor against Natron in the amount of $1,643.79.

"7. Each party shall bear its own costs.

"ENTERED this 3rd day of April, 1980.

 s/s MICHAEL T. DUGAN, II

 Judge, Marion Superior Court"

## ISSUES

The issues which appellant raises for our consideration are centered around his allegations that the court's judgment was contrary to the evidence and to the law on both his wage and minority shareholder claims.

## DISCUSSION AND DECISION

Indiana Rules of Procedure, Appellate Rule 8.3(A)(4) requires that an appellant's brief contain a statement of the case which indicates "its disposition in the court below, including a verbatim statement of the judgment." Failure to comply with A.R. 8.3 may result in an affirmance of the trial court's judgment. *Citizens Nat'l Bank v. Harvey*, (1976) 167 Ind.App. 582, 334 N.E.2d 719, 339 N.E.2d 604. In this case appellant not only misstated the disposition of the case in the court below,[1] but also failed to set forth a verbatim statement of the

---

1. Appellant asserts that his appeal is taken from a "directed verdict" rather than from specific findings of fact, conclusions of law, and

judgment at least partly in his favor as is reflected by the record.

court's findings, conclusions, and judgment. However, because the appellee's brief did contain such a statement and because we prefer to decide a case on its merits whenever possible, *Abney v. Abney*, (1978) Ind. App., 374 N.E.2d 264, *cert. den.* 439 U.S. 1069, 99 S.Ct. 836, 59 L.Ed.2d 34, we shall proceed to decide this case on its merits.

*Issue One* : *Wage Claim*

 Ross contends that the trial court erred in failing to conclude that Natron Corp., Tavel, and Lawson breached their employment contract to pay him one-third of Natron's first annual profits, or $29,-222.55. Ross bases his claim on the May 12, 1977, wage resolution by the board of directors of Natron Corp. which he argues reflects his wage "agreement" with the corporation and other directors. This resolution was entered in the corporate minutes in the following language:

> "BE IT RESOLVED, That Gary Ross be paid the sum of $700.00 per week as salary and be furnished an automobile by the corporation for his use. In addition, Gary Ross shall receive one-third (⅓) of the profits following the issuance of the annual financial statement of the corporation. In the event of his termination, voluntary or involuntary, prior to the end of the fiscal year, he shall be entitled to a pro rata share of the profits based upon the quarterly statement following such termination.

> "BE IT FURTHER RESOLVED, that Gary Ross be given twenty percent (20%) of the stock of the corporation subject to his signing a noncompetition agreement and giving the corporation the option to purchase said shares following his termination with the company."

Although Ross avers that "[t]he evidence in the record is undisputed that there was never a change in this contract of employment entered into between Gary Ross and Natron," he is in error. The evidence, including Ross's own testimony, unconditionally supports the court's findings that the

wage resolution set out in the corporate minutes had been modified at least twice between May 1, 1977, and April 30, 1978, the first fiscal year of Natron's corporate existence. The first modification of the wage agreement is reflected in the court's finding number five which is supported by uncontroverted evidence in the record. The second modification of the above-recorded agreement concerning entitlement to profits and its relationship to stock holdings is reflected in the court's findings numbered nine, ten, and eleven. Ross contests these findings as unsupported by any evidence, but a review of the record, reveals that evidence on these matters was conflicting. We remind appellant that on review the appellate court will neither reweigh conflicting evidence nor judge the credibility of witnesses. Moreover, we shall consider only that evidence which supports the trial court's findings of fact, conclusions of law, and judgment, together with all reasonable inferences which may be drawn therefrom. *Blade Corp. v. American Drywall, Inc.,* (1980) Ind.App., 400 N.E.2d 1183, *trans. den.* Where, as in this case, the trial court has made specific findings of fact pursuant to Ind.Rules of Procedure, Trial Rule 52(A), we shall not set aside those findings unless they are clearly erroneous. Indiana Rules of Procedure, Appellate Rule 15(N); *Cole Real Estate Corp. v. People's Bank & Trust Co.,* (1974) 160 Ind.App. 88, 310 N.E.2d 275, *trans. den.* Because there is evidence in the record from which the court could reasonably infer that the wage agreement between Ross and Natron had been modified, its finding that a modification had indeed occurred was supported by the evidence.

 Furthermore, because there is evidence, or reasonable inferences therefrom, to support those specific modifications of the wage agreement found by the court, appellant's arguments that such modifications did not reflect an "accord and satisfaction" or rise to the level of a "novation,"[2] and thus that the court's judgment

---

2. We encourage precision among members of the bar with respect to the use of legal terms.

For elucidation regarding the use of "nova-

with regard to the wage claim was contrary to law, must fail. Appellant argues at length that the technical requirements for a novation were not met in this case. His major point seems to be that there was and could be no valid consideration for the modified agreement because neither Tavel nor Natron had any interest in the stock of the Tavel children, hence neither party had the power to cancel or transfer 13% of the stock to him. Such contentions are clearly contrary to the evidence and the law in this case. The evidence was undisputed that Tavel was custodian of more than 13% of Natron's stock under the Uniform Gifts to Minors Act, Ind.Code 30–2–8–1 *et seq.* Furthermore, IC 30–2–8–4(f) provides that among those powers conferred upon a custodian under this act

"[t]he custodian may sell, exchange, convert or otherwise dispose of custodial property in the manner, at the time or times, for the price or prices and upon the terms he deems advisable. He may vote in person or by general or limited proxy a security which is custodial property. He may consent, directly or through a committee or other agent, to the reorganization, consolidation, merger, dissolution or liquidation of an issuer, a security which is custodial property, and to the sale, lease, pledge or mortgage of any property by or to such an issuer, and to any other action by such an issuer. He may execute and deliver any and all instruments in writing which he deems advisable to carry out any of his powers as custodian."

Tavel clearly had the power to agree to transfer to Natron and ultimately to Ross those shares of stock which he held as custodian for his children, and the only persons who could complain that they were wrongfully divested of those shares were the Tavel children. Ross has no standing to raise their claim.[3]

Neither are we persuaded by Ross's arguments contesting the validity of the transfer of the Tavel children's shares for the lack of endorsement on the back of the shares as is provided for in Natron's bylaws. Section 5 of those bylaws dealing with the transfer of stock reads:

"Title to a certificate and to the shares represented thereby can be transferred only:

"(1) By delivery of the certificate endorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby; or

"(2) By delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney to sell, assign, or transfer the same or the shares represented thereby, signed by the person appearing by the certificate to be the owner of the shares represented thereby. Such assignment or power of attorney may be either in blank or to a specified person."

Indiana Code 26–1–8–307, however, provides:

"Where a security in registered form has been delivered to a purchaser without a *necessary* endorsement he may become a bona fide purchaser only as of the time the endorsement is supplied, but against the transferor the transfer is complete upon delivery and the purchaser has a specifically enforceable right to have any *necessary* endorsement supplied." (Emphasis added.)

In other words, delivery[4] without a *necessary* endorsement *will* effect transfer and any purchaser,[5] here either Natron or Ross, had an enforceable right to have that necessary endorsement supplied.

---

tion," please see 6 A. Corbin, Contracts § 1297 (1952).

**3.** Ross recognizes Tavel's de facto majority shareholder status, however, when he asserts his minority shareholder claim.

**4.** "Delivery" is defined at Ind.Code 26–1–1–201(14) as "voluntary transfer of possession."

**5.** Indiana Code 26–1–1–201(33): "'Purchaser' means a person who takes by purchase"; IC 26-1-1–201(32): "'Purchase' includes taking by . . . issue or reissue, gift, or any other voluntary transaction creating an interest in property."

We do not believe, therefore, that either Tavel's status or the lack of an endorsement on the surrendered shares constituted a lack of consideration for modification of Ross's wage agreement. The court's finding number 10 was not in error.

■ Appellant also states that there is *no* evidence in the record to show that he expressly agreed to a modification of his employment agreement which would replace the one-third profit with increased stock holdings and in fact refused to accept the stock certificate for 39 shares of Natron's stock. He contends, therefore, that the court's conclusion that Ross was not entitled to one-third of Natron's profits "by some means other than accumulation of profits in the capital of the corporation" was erroneous as a matter of law, citing *Morton v. E–Z Rake, Inc.,* (1979) Ind.App., 397 N.E.2d 609. We do not agree. Again evidence as to what agreement the parties reached at the April 1978 meeting is conflicting, but reasonable inferences from the undisputed fact that Ross was the one who initiated the meeting in order to increase his stockholdings from 20% to 33% would support the court's finding. It is not unreasonable to assume that Ross wanted his stockholdings to reflect one-third of the profits which were now invested in the capital of the corporations. That no one testified to an express agreement to this effect is of no import. This court has clearly held that, during the term of a written employment contract,[6] parties may orally or by implication as a result of their conduct change, modify, or waive the terms of an employment contract. *Nationwide Mutual Insurance Co. v. Pomeroy,* (1967) 141 Ind. App. 288, 227 N.E.2d 448, *trans. den.* The court's conclusion that Ross was not entitled to profits by a means other than accumulation of capital in the corporation was not contrary to law.

We also reject appellant's argument that his case is controlled by *Morton v. E–Z Rake, Inc., supra,* and that the provision in his initial contract entitling him to one-third of the profits bears no relationship to his stockholdings in the corporation.

*Morton v. E–Z Rake, Inc., supra,* is distinguishable from the instant case in at least two substantial respects. First, *Morton* involved allegations of wrongful termination under an express, written contract which was not challenged or shown to have been modified, changed, or amended in any way. That is not so in this case. Thus, in *Morton* the court simply applied the terms of the contract regarding salary and profits as written with a pro rata adjustment for the length of employment. Second, in *Morton* the wage agreement contained no reference to appellant's shareholder status, and the issue of the relationship between the profits of the corporation and shareholder status in yet a second corporation formed with profits from the first corporation did not arise. Therefore, unlike the court in *Morton,* we do not conclude that the trial court's interpretation of the employment contract here was clearly erroneous. We decline to reverse appellant's negative judgment on the issue of his wage claim.

Because we hold that the court did not err in finding that the original wage agreement between Ross and Natron was modified to substitute increased shareholder status for the payment of profits from the interlocking, tax sheltering corporations, we also hold that the trial court did not err in refusing to find for appellant on his wage lien theories since no wages were due him.

*Issue Two : Minority Shareholder Claim*

Appellant Ross contends that the decision by the controlling shareholders of National Energy, Tavel and Lawson, to divert $30,-000 .of National Energy's assets to Natron and subsequently to National Alarm was fraudulent and in derogation of their fiduciary duties of good faith and fair dealing to him. Ross argues that Natron's conditioning its assent to cancel its five year lease with National Energy only upon the pay-

---

6. Although the issue is not before us, we assume for purposes of discussion, as do the parties, that the corporate resolution set out above constituted a written employment contract. All parties agree that Ross never signed the noncompetition or stock option agreement.

ment of $30,000 was obviously a sham transaction designed to channel funds through Natron to National Alarm since Natron was in no position to make continued rental payments and at the time of the agreement essentially had ceased doing business. Appellees, on the other hand, argue that because neither the shareholders nor the corporations involved at any time dealt with or intended to deal with the corporations at arm's length, and had from the beginning treated both as one, Ross is now estopped from attacking the corporations' failure to deal with the winding up of corporate affairs in an arm's length fashion. Appellees point out that Ross was President of both corporations and was involved in establishing both of them in order to reap the full benefits of the tax laws. They also point to an agreement between Ross and Tavel to the effect that Ross could have a 1973 Ford van and some miscellaneous construction equipment upon the dissolution of the business provided National Alarm received repayment of its interest-free loan to Natron. Although Ross denied that he made any such agreement, Tavel asserts that he did. Once again we reiterate our position when conflicting evidence is presented: we refuse to weigh the evidence or judge the credibility of the witnesses. That is the duty of the trier of fact. Because there is evidence in the record, or reasonable inferences therefrom, to support the trial court's choice of Tavel's version over Ross's, we are bound by the trial court's choice.

■ Allegations of improper manipulation of funds or wrongful diversion of corporate assets by a controlling shareholder create a cause of action in favor of the corporation rather than in favor of the minority shareholder. 13 W. Fletcher, Cyclopedia of the Law of Private Corporations § 5924 (rev. perm. ed. 1980). Such actions are deemed to be a breach of the controlling shareholder's fiduciary duty which he owes to the corporation. Indiana courts have applied the principle of "incorporated partnerships" to closely held corporations where there is a lack of separation between the shareholder-owners and the director-mana-

gers, which principle imposes a fiduciary duty of fair dealing, honesty, and openness upon the shareholding "partners." *Cressy v. Shannon Continental Corp.*, (1978) Ind. App., 378 N.E.2d 941, *trans. den.; Hartung v. Architects Hartung/Odle/Burke, Inc.*, (1973) 157 Ind.App. 546, 301 N.E.2d 240, *trans. den.* (1974). Thus, there is really no distinguishable difference between those fiduciary duties which Tavel and Lawson owed Ross either as a minority shareholder or as an "incorporated partner."

Actions for breach of a fiduciary duty are brought in equity for, as was cited by this court in *Epperly v. E & P Brake Bonding, Inc.*, (1976) 169 Ind.App. 224, 348 N.E.2d 75 at 82:

> " 'If a court of equity could not look behind the corporation to the shareholders, who are the real and substantial beneficiaries, and ascertain whether these ultimate beneficiaries of the relief it is asked to grant have any standing to demand it, the maxim that equity looks to the substance, and not the form, would be very much limited in its application. *Home Fire Ins. Co. v. Barber* (1903), 67 Neb. 644, 665, 93 N.W. 1024, 1032.' "

■ It has also been posited by our Supreme Court that where none of the shareholders of the corporation is entitled to bring a derivative action to enforce the corporation's cause of action because each shareholder participated in the wrong complained of, the corporation itself is not entitled to bring the action. *Gabhart v. Gabhart*, (1977) 267 Ind. 370, 370 N.E.2d 345. Because the fiction of the corporate entity will be disregarded where the corporate and individual transactions have not been separate and distinct, if Ross participated in the wrong of which he now complains, equity will estop that complaint in either its personal or corporate posture. It is uncontroverted that Ross was involved from the very beginning with the utilization of the corporate facade of National Energy for tax control purposes. The only purpose for the formation of National Energy, of which Ross was a shareholder, director, and the

President, was to siphon profits from Natron by way of inflated rental payments and remodeling and other expenses. It is not argued by Ross that the decisions involved relating to the corporate transactions between National Alarm, Natron, and National Energy prior to September 1978 were anything other than openly and voluntarily arrived at by all three of the parties at the time they were made. It would be inequitable at this point then to permit Ross to assert either in his name or in the name of National Energy the fiction behind Natron's agreement to cancel its lease for $30,000 so that the funds flowing back to Natron could be used to pay its creditors. Both Natron and National Energy were really one corporation for all intents and purposes other than the payment of taxes. The law is clear that corporate property must be appropriated to a corporation's debts before any distribution thereof is made to the shareholders. 6 I.L.E. *Corporations* § 124 (1958); *Campbell v. Grant Trust & Savings Co.*, (1932) 97 Ind.App. 169, 182 N.E. 267, *trans. den.* (1933). Here the court found that Natron in fact owed National Alarm $30,000, hence payment of that debt was mandated by law prior to any distribution of corporate assets to Ross as a shareholder.[7]

Finally, the court found, and evidence or reasonable inferences therefrom will support, the fact that Ross agreed to accept the 1973 van and equipment from the corporation to use in his own business in return for his cooperation in settling the unfinished business of the corporation, including the payment of Natron's creditors. Where the principals of a corporation have settled their claims with respect to corporate affairs, they will be barred from reasserting those claims already compromised. *Epperly v. E & P Brake Bonding, Inc., supra.*

After a thorough review of the record we are not firmly or definitely convinced that the trial court erred. *See, University Case-*

*work Systems, Inc. v. Bahre*, (1977) 172 Ind.App. 624, 362 N.E.2d 155, *trans. den.*; *Borger v. Garver*, —— Ind.App. ——, 417 N.E.2d 370 (1981). We agree with the trial court that appellant has no further corporal court that appellant has no further corporate or personal claims against Natron Corp., National Energy Systems, Inc., or directors Tavel and Lawson either for wages or as a minority shareholder.

Judgment affirmed.

NEAL, P. J., and ROBERTSON, J., concur.

---

7. We are presented neither with an "interested director" claim regarding the interest free loan from National Alarm to Natron nor with the contention that such "loan" was in fact a contribution to capital. We let such sleeping dogs lie.