In re James Darrel KRAUSE, Debtor.

Darwin E. MILLER,
individually, Plaintiff,

and

CLM Insurance Agency, Inc. an Indiana Corporation by Darwin E. Miller, Shareholder, Plaintiff,

v.

James Darrel KRAUSE, Defendant.

Bankruptcy No. 85–61962.
Adv. No. 86–6032.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division at Gary/Lafayette.

Sept. 9, 1988.

---

David Foebler, Valparaiso, Ind., for plaintiff.

Roger Farley, Merrillville, Ind., for defendant.

### MEMORANDUM OPINION AND ORDER

KENT LINDQUIST, Chief Judge.

I

*Statement of Proceedings*

Darwin E. Miller, as the original and sole Plaintiff in this adversary proceeding, filed his initial complaint versus the Debtor, James Darrel Krause (hereinafter: "Defendant") on March 24, 1986, alleging that a certain indebtedness by the Defendant to

the Plaintiff is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and § 523(a)(6).

On June 24, 1986, the Defendant filed a Motion for Summary Judgment and Motion for Judgment on the pleadings. The Plaintiff filed his answer thereto on July 24, 1986, and the Defendant filed his reply on August 11, 1986.

On September 22, 1986, the Plaintiff filed his affidavit in opposition to the Defendant's motion.

On February 6, 1987, the Court issued its Memorandum Opinion and Order in which it treated the Defendant's motion for a judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) as a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), and sustained the Defendant's motion, but gave the Plaintiff 20 days to plead over.

On February 26, 1987, the Plaintiff Miller individually and CLM Insurance Agency, Inc. (hereinafter: "CLM") by Darwin Miller, an alleged shareholder of CLM as co-plaintiff, filed their first amended complaint praying that the alleged indebtedness of the Defendant to the Plaintiffs is nondischargeable pursuant to 11 U.S.C. § 523.[1] Although, the amended complaint is in one legal paragraph, the various rhetorical paragraphs make allegations under § 523(a)(2)(A), (4), and (6).

The Plaintiffs allege in their amended complaint that CLM was illegally and improperly dissolved by the Defendant as president and chairman of the Board of CLM, which precluded CLM from bringing this action directly.

On March 12, 1987, the Defendant filed his motion to dismiss the Plaintiffs' amended complaint pursuant to Fed.R.Civ.P. 12(b)(2) and 12(b)(6), a motion for a judgment on the pleadings and a motion to strike.

On April 17, 1987, the Plaintiffs filed their answer to the Defendant's motion for judgment on the pleadings and to dismiss. A hearing was held on said motions on July 7, 1987, wherein arguments were heard and the Court took said motions under advisement, on the motion to dismiss and the motion for judgment on the pleadings. The Plaintiffs stipulated that the Defendant's motion to strike should be granted as to rhetorical paragraph 54 of the amended complaint and it is, SO ORDERED.

The Court takes judicial notice of the record in the Debtor's main case, and finds that the Debtor received his general discharge in bankruptcy pursuant to 11 U.S.C. § 727 on June 6, 1986, or prior to the filing of the amended complaint on February 26, 1987, in which CLM was purportedly added as a co-plaintiff.

## II

*Conclusions of Law and Discussion*

### A

*Motion to Dismiss Plaintiff CLM for Improper Joinder*

The Defendant asserts in his motion to dismiss filed March 12, 1987, that the Plaintiff Miller has improperly joined the alleged co-plaintiff CLM without seeking court approval. The Defendant also asserts that CLM is not a creditor of the Defendant and therefore this Court lacks jurisdiction over CLM. Fed.R.Civ.P. 12(b)(2).

In addition, the Defendant's motion asserts that the Plaintiff Miller cannot bring this action on behalf of the Plaintiff CLM

---

**1.** At rhetorical paragraphs 1 through 33 of the amended complaint it is alleged that the debt in question is nondischargeable based on fraud pursuant to § 523(a)(2)(A). It is not clear from the pleading if these allegations are by the Plaintiff Miller individually, by CLM through Miller as stockholder in a derivative status, or both. At rhetorical paragraphs 34 through 45 of the amended complaint, the Plaintiff Miller also alleges that the Defendant's conduct also renders the debt nondischargeable under § 523(a)(6), while at rhetorical paragraphs 46 through 53, the Plaintiff alleges that the Defendant's conduct renders the debt nondischargeable pursuant to § 523(a)(4). It is not clear from the way rhetorical paragraphs 46 through 53 are framed as to whom the alleged breach of duty by the Defendant was allegedly owing, i.e. to the Plaintiff Miller, individually as a secured creditor of the Defendant, or to CLM, the corporation of which the Plaintiff Miller had the status of a stockholder to bring a derivative action on behalf of CLM, or both.

since the Plaintiff Miller is not a stockholder, officer or director of said corporation.

Federal Rule of Civil Procedure 12(b)(2) provides that the defense of lack of jurisdiction over the person can be raised by motion. It should also be noted that pursuant to Fed.R.Civ.P. 12(h)(3), that whenever it appears by suggestion of the parties or otherwise that the Court lacks jurisdiction of the subject matter, the Court may dismiss the action.

Although not referred to by the Defendant in his motion, Fed.R.Civ.P. 24 governing intervention also applies to the putative co-plaintiff CLM's attempt to be added to this adversary proceeding as a co-plaintiff with the sole original Plaintiff Miller, by virtue of the amended complaint filed February 26, 1987. This "amended" complaint is not simply to amend the original complaint filed solely by the Plaintiff Miller in his individual capacity pursuant to Fed.R.Civ.P. 15. As to the alleged co-plaintiff CLM, the amended complaint is an attempted initiation of an original action by CLM as intervenor Plaintiff versus the Defendant on the date of the filing of the purported amended complaint, or February 26, 1987.

Federal Rule of Civil Procedure 24(c), provides that a person desiring to intervene shall serve a motion to intervene upon the parties as provided by Rule 5 stating the grounds therefore, and shall be accompanied by a pleading setting forth the claims or defense for which intervention is sought. This was clearly not done here. Thus, the addition of the purported co-plaintiff CLM to the amended complaint prior to service of a motion to intervene accompanied by a proposed intervenor's complaint was procedurally defective and technically incorrect. The courts have varied in their approach when Fed.R.Civ.P. 24(c) is not complied with procedurally. Some courts strictly construe the requirements of Fed.R.Civ.P. 24(c) while other courts have not required strict compliance with the literal requirements thereof. *See*, Discussion, 26 Fed. Proc.Lawyer Ed. § 370, *Parties.*

In the interest of judicial economy and to avoid the duplication of time and expense by sustaining the Defendant's motion, and in requiring CLM to properly proceed pursuant to Fed.R.Civ.P. 24(c), the Court will treat the amended complaint of February 26, 1987 as it relates to CLM only as a motion by CLM to intervene as co-plaintiff on that date, and will rule thereon.

The Plaintiff Miller alleges at rhetorical paragraph 37, that the Agreement entered into between the Plaintiff Miller and the Defendant on June 1, 1982 (Rhetorical para. 17, Exhibit # 1), whereby the Defendant promised to reconvey the stock in CLM Corp. is a valid and enforceable security agreement pursuant to I.C. 26–1–9–203, that the Plaintiff has the status as a secured creditor (Rhetorical paras. 34–39), and thus, the Plaintiff Miller has property rights in the 75 shares of stock transferred by the Plaintiff Miller to the Defendant pursuant to said contract.

Thus, the Plaintiff by his own pleading admits that he is not a true stockholder of CLM, but that he has a security interest in 75 shares of stock of CLM.

At rhetorical paragraph 4 of the amended complaint, the "plaintiff" (apparently the Plaintiff Miller, though there are two co-plaintiff's in the caption to the amended complaint) alleges that he is bringing this action individually, and on behalf of CLM, while at rhetorical paragraph 5 the Plaintiff Miller alleges he was a stockholder at the time of the transaction of which he complains and/or had the equitable rights of stockholder status.

The initial question thus comes down to what "interest", if any, the Plaintiff Miller has in the CLM stock, and if he had an interest therein, whether that interest vested in the Plaintiff Miller the requisite standing to bring this adversary proceeding on behalf of the proposed intervenor-Plaintiff CLM as an alleged "shareholder" of CLM pursuant to Fed.R.Civ.P. 23.1.

The Plaintiff Miller cannot have it both ways. He was either a stockholder of CLM, or he was not a stockholder of CLM at the time of the transactions of which he complains. His own amended pleading asserts a security interest in the stock (rheto-

rical paras. 34–39), and yet he alleges that he was either a shareholder at the time of the transactions of which he complains and/or had the equitable right to shareholder status (rhetorical para. 5).

Pursuant to Fed.R.Civ.P. 23.1, which was added to the Federal Rules of Civil Procedure in 1966, as made applicable by Bankr.R. 7023.1, "Derivative Proceedings By Shareholders", a derivative action may be brought by one or more stockholders to enforce a right of a corporation, the corporation having failed to enforce a right which may be properly asserted by it. That Rule also provides that the complaint shall be verified, and allege that the Plaintiff was a shareholder at the time of the transaction of which he complains, that the action is not a collusive one to confer jurisdiction on the court, and also allege with particularity the efforts, if any, made by the Plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary from the shareholders, and the reasons for his failure to obtain the action or for not making the effort. The amended complaint is verified and asserts no collusion to confer jurisdiction (rhetorical para. 6).

The term "derivative action" which defines the scope of Fed.R.Civ.P. 23.1 applies only to those actions in which the right claimed by the shareholder is one the corporation itself could have enforced in court. *Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984).

A claim pressed by stockholders against directors is not their own, but that of the corporation; the corporation is the real party in interest, the stockholder being at best a nominal plaintiff, and the proceeds belong to the corporation and is bound by the suit. *Ross v. Bernhard,* 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970).

A shareholder has no standing to bring a civil action at law versus faithless directors and managers where the officer, director or controlling stockholder has breached the fiduciary duty to the corporation since the corporation and not the shareholders suffer the injury; however, equity permits a shareholder to step into the corporation's

shoes and to seek in the corporation's right, restitution that the shareholder could not demand on his own. *Lewis v. Knutson,* 699 F.2d 230 (5th Cir.1983).

The requirements of Fed.R.Civ.P. 23.1 for a stockholder commencing a derivative action do not apply where the plaintiffs are asserting private injury for which they seek personal redress, and are not claiming damages on behalf of the corporation. *Simcox v. San Juan Shipyard, Inc.,* 754 F.2d 430 (1st Cir.1985).

Federal Rule of Civil Procedure 23.1 is a rule of pleading and not one of substantive law. *Nelson v. Pacific Southwest Airlines,* 399 F.Supp. 1025 (S.D.Cal.1975) *cf.* I.C. 23–1–32–1 regarding the right to commence or maintain a derivative proceeding effective, August 1, 1987.

Rule 23.1 leaves open both the issue of who is a "shareholder", and the issue of what law controls this determination; as for the latter issue, the majority position seems to be that standing to sue on state derivative claims is determined by state substantive law, while for federal claims, federal substantive law controls. *Mullen v. Sweetwater Dev. Corp.,* 619 F.Supp. 809 (D.C.Colo.1985), *see, e.g., Fischer v. CF & I Steel Corp.,* 599 F.Supp. 340 (S.D.N.Y. 1984) (Federal law controls when plaintiffs assert causes of action based solely on violation of the Clayton Anti-trust Act); *Brooks v. Weiser,* 57 F.R.D. 491 (S.D.N.Y. 1972) (state law governs in diversity action); *Entel v. Guilden,* 223 F.Supp. 129 (S.D.N.Y.1963) (state law governs on whether warrant holder has status of stockholder). *See also,* 19 Am.Jur.2d *Corporations,* § 2374.

Inasmuch as the allegations of the Plaintiff Miller on behalf of CLM are that the Defendant has violated the corporate laws of the State of Indiana (rhetorical paras. 27 and 28), the Court must look to the laws of Indiana to determine whether the Plaintiff Miller, as a party secured by the stock of CLM, owned by the Defendant, was a stockholder of CLM at the time of the transaction of which he complains for the purposes of Fed.R.Civ.P. 23.1.

Pursuant to the Indiana General Corporation Act in effect when the Agreement was executed, the term "shareholder" meant "one who is a holder of record of shares of stock in a corporation, unless the context otherwise requires". I.C. 23–1–1–1(f). The Indiana Business Corporation Law Act, enacted effective August 1, 1987, P.L. 149–1986, and which repealed the Indiana General Corporation Act defines "shareholder" at I.C. 23–1–20–24 as meaning "the person in whose name shares are registered in the records of a corporation or the beneficial owner of shares to the extent of the rights granted pursuant to a recognition procedure or a disclosure procedure under I.C. 23–1–30–4."

The position of a "creditor" and a "stockholder" are mutually exclusive of each other, and one cannot logically be a creditor and a stockholder by virtue of the same instrument in respect to the same fund. *Federal Deposit Ins. Corp. v. Dept. of Financial Institutions,* 113 Ind.App. 14, 44 N.E.2d 992 (Ind.App.1942).

■ As between the parties, registration or transfer of stock on the corporate books is not necessary to vest an assignee with equitable title to stock assigned to him. *Hill v. Kerstetter,* 43 Ind.App. 1, 86 N.E. 858 (Ind.App.1909).

■ Between the transferor and the transferee, the UCC provides the transfer of stock is complete on delivery. I.C. 26–1–8–307; 15A Am.Jur.2d § 101, *Commercial Code.*

The Agreement (Exhibit "A–1" to the complaint) states at Clause 1 that:

*Upon execution hereof,* Darwin Miller *will* endorse the certificate of stock representing ownership of seventy-five (75) shares of CLM Insurance Agency, Inc., and deliver the same to James Krause, fellow shareholder in CLM Insurance Agency, Inc.

There is no legal or factual issue raised by the parties that the contract was not duly executed, or that the stock was not endorsed and delivered.

At Clause 4 of the June 1, 1982, agreement, it was agreed between the Plaintiff Miller in his individual capacity, and the Defendant, both as the shareholders of CLM that:

[i]n the event *CLM* ... does not perform its agreements with Bank of Highland ... and the Chesterton State Bank pursuant to the terms here about and said institutions, ... bring suit versus CLM ... by reason of corporate default and the corprates (sic) promise to pay said promissory note or in the event that said banking institutions seek to enforce any personal guaranty of Darwin Miller to said banking institutions by reason of a personal guaranty of Darwin Miller to said banking institutions of said corporation obligations, then in that event, James Krause, upon notice of said conditions, *will immediately reconvey* to Darwin Miller seventy five (75) shares of corporation stock in CLM.... (Emphasis added).

The record does not indicate if the stock certificate or certificates originally issued to the Plaintiff Miller for the 75 shares in CLM were in fact endorsed, assigned, and physically transferred to the Defendant by the Plaintiff and in turn entered on the stock transfer records of CLM, and registered in the Defendant's name. However, this issue has not been raised by the parties, and the court will assume endorsement and delivery. Registration is not relevant for the purposes of this adversary proceeding, and Fed.R.Civ.P. 23.1, although it might be relevant for other purposes such as the payment of dividends, or as to who could vote at a stockholders meeting, etc.

The Court is cognizant that the Plaintiff may plead alternative, hypothetical and mutually exclusive claims versus the Defendant. Fed.R.Civ.P. 8(e)(2). However, procedurally for the co-Plaintiff Miller to have standing to bring a derivative stockholder suit on behalf of CLM versus the Defendant, the Court must decide the threshold question of whether the Plaintiff Miller was, as a matter of law, a "stockholder" for the purposes of Fed.R.Civ.P. 23.1 at the time of the transaction complained of to determine if the putative intervenor and

co-plaintiff CLM, by and through the Plaintiff Miller, has standing in the first instance to prosecute this adversary proceeding pursuant to Fed.R.Civ.P. 23.1 upon behalf of CLM by virtue of rhetorical paragraphs 1 through 33 of the first amended complaint.

The Court finds that on the date of the Agreement, June 1, 1982, the Plaintiff Miller, at a minimum, transferred at least all of his equitable rights and interests in said stock to the Defendant. This is true even though transfer of ownership of the stock may have not been legally registered on the books and records of CLM. The language of the Agreement is clear and unambiguous, and thus the sale of the CLM stock was clearly consummated on the date of execution as expressly provided for in the Agreement.

Thus, at the very most, the Plaintiff Miller is a secured party rather than a true stockholder of CLM. It should also be noted that the Plaintiff Miller is a secured party of the Defendant, and not CLM, for the property sought to be secured is the Defendant's interest in the CLM stock and not the assets of CLM, and the Plaintiff Miller may have held a security interest in the CLM stock owned by the Defendant to secure the performance of CLM.

Whether an agreement creates a lien depends on state law. *In the Matter of Martin Grinding and Machine Works, Inc.,* 793 F.2d 592, 594 (7th Cir.1986), *citing, Butner v. United States,* 440 U.S. 48, 54–57, 99 S.Ct. 914, 917–919 59 L.Ed.2d 136 (1979).

The Court must thus look to Indiana law to determine whether or not the Agreement constitutes the granting of a security interest in the CLM stock by the Defendant to the Plaintiff Miller, so that he would have the status of a "stockholder" to bring a derivative suit on behalf of CLM versus the Defendant pursuant to Fed.R.Civ.P. 23.1.

As noted by the Court in *Kruse, Kruse & Miklosko v. Beedy,* 170 Ind.App. 373, 353 N.E.2d 514 (Ind.App. 3rd Dist.1976), I.C. 26-1-9-203(1) and I.C. 26-1-9-204 (as then constituted) incorporate four general requirements for the creation of an enforceable security interest. Indiana Code 26-1-9-204(1) provides that, "a security interest cannot attach until there is an agreement (subsection (3) of section [26-1] 1-201) that it attach, value is given and the debtor has rights in the collateral. These four requirements are as follows:

1) There must be an agreement creating or providing for a security interest.

2) The debtor must have signed a security agreement containing a description of the collateral; or the secured party must acquire possession of the collateral.

3) The debtor must acquire rights in the collateral.

4) And, the secured party must give value.

*Id.* 353 N.E.2d at 555.

The *Kruse* Court added:

As for the first such requirement, I.C. 1971, 26-1-1-201(3) (Burns Code Ed.), provides that:

" 'Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this act (sections [26-1] 1-205 and [26-1] 2-208). Whether an agreement has legal consequences is determined by the provisions of this act, if applicable; otherwise by the law of contracts (section [26-1] 1-103). (Compare 'Contract.')".

Indiana Code 26-1-9-204(1) and 9-203 were amended when the Indiana legislature adopted many facets of the 1972 version of the Uniform Commercial Code, and the provisions regarding the attachment of a security interest were moved from § 9-204 to § 9-203. Thus, I.C. 26-1-9-203 now sets out when a security agreement attaches and the necessity for "value".[2]

**2.** The Agreement in question was executed prior to April 1, 1986, and thus the § 9-204 as constituted prior to the January 1, 1986 Amendments is applicable to the Agreement as to the general

*validity* thereof. I.C. 26-1-9-204 was rewritten by a 1985 amendment, P.L. 93-1985, Sec. 14, Eff. January 1, 1986. *See* notes to I.C. 26-1-1-105 which discusses P.L. 93-1985, Sec. 42 to 46,

Indiana Code 26–1–9–105(1)(h) states that "a 'security agreement' means an agreement which creates or provides for a security interest." Indiana Code 26–1–1–201(37) defines "security interest" as "an interest in personal property or fixtures which secures payment or performance of an obligation." An "agreement" is defined as "the bargain" of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in I.C. 26–1–1–205 and I.C. 26–1–1–208. *See*, I.C. 26–1–1–201(3). Whether an agreement has legal consequences is determined by the provisions of I.C. 26–1, if applicable; otherwise, by the law of contracts (I.C. 26–1–1–103) (compare "contract"). I.C. 26–1–1–201(3); *Continental Grain v. Followell*, 475 N.E.2d 318 (Ind.App. 1st Dist.1985). Finally, the term "contract" is defined as "the total legal obligation which results from the parties' agreement as affected by the Act and any other applicable rules of law. (Compare "Agreement"). I.C. 26–1–1–201(11).

The rules relating to the construction of any ordinary contract to be applied by a federal court to a state-created contract are those of the state where the contract was created. *Transcontinental & Western Air, Inc. v. Koppal*, 345 U.S. 653, 73 S.Ct. 906, 97 L.Ed. 1325 (1953). Pursuant to Indiana Code 26–1–1–103, the law of contracts supplements the provision of the Indiana Uniform Commercial Code which is applicable to these security agreements.

▆▆▆ In Indiana under the "four corners" rule in construing written instruments, determination of the intent of the parties is limited to the express language found within the instrument and where there is no ambiguity, extrinsic evidence cannot be presented as to the intentions of the parties. *Skezpek v. St. Joseph Valley Bank*, 469 N.E.2d 774 (3rd Dist.Ind.App. 1984). Unambiguous language is conclusive upon the parties and the Court. *Turnpaugh v. Wolf*, 482 N.E.2d 506 (4th Dist. Ind.App.1985). Thus, where no ambiguity exists and the terms of the contract are plain and clear on the face of the document, the terms are conclusive as to the contract's meaning. *Young v. VanZandt*, 449 N.E.2d 300 (1st Dist.Ind.App.1983); *Markskill Specialties Inc. v. Barger*, 428 N.E.2d 65 (3rd Dist.Ind.App.1981).

▆▆▆ The Court must give effect to the meaning and intention of the parties as expressed in the language of the contract, and where the terms of the contract are plain and free from uncertainty, it is not the proper function of the Court under Indiana Law to use any rules of interpretation or construction in determining the provisions of the agreement. *Williams v. National Can Corp.*, 603 F.Supp. 1268 (D.C. Ind.1985).

As pointed out in *Rempa v. LaPorte Production Credit Ass'n*, 444 N.E.2d 308, 311 (Ind.App.3rd Dist.1983), I.C. 26–1–9–105(L) (previously (H)), defines a "security agreement" as, "an agreement which creates or provides for a security interest." The Court noted that an "agreement" is also defined in the Code as "the bargain of the parties *in fact* as found in their language or by implication from other circumstances including curse of dealing and usage of trade as provided for in the Act (Sections 1–205 and 2–208) (emphasis added) I.C. 26–1–1–201(3).", and that a security agreement is "simply a visage of the underlying contract between the debtor and the creditor." The *Rempa* court quoted White and Summers, *Uniform Commercial Code* (2nd Ed.), pp. 904–906 with approval which states:

Section 9–203 requires a 'security agreement,' a term defined in 9–105 as 'an agreement which creates or provides

effective January 1, 1986, and the application of the amendments to security agreements entered into prior to January, 1986. Section 42 provides that a pre-January 1, 1986, Security Agreement validly entered into after July 1, 1964 and before January 1, 1986, which was subject to the provisions of I.C. 26–1, as effective on December

31, 1985, and which would have been subject to the Act if it had been entered into after December 31, 1985 and the rights, duties and interest flowing from such a transaction remain valid after December 31, 1985 and can be terminated, completed, consummated or enforced under the new Act.

for a security interest.' The conjunction of 9–203 and 9–105 calls for two independent inquiries. *The court must first resolve, as a question of law, whether the language embodied in the writing objectively indicates that the parties may have intended to create or provide for a security interest. If the language crosses this objective threshold, that is, if the writing evidences a possible secured transaction and thus satisfies the statute of frauds requirement, then the factfinder must inquire whether the parties actually intended to create a security interest. Parol evidence is admissible to inform the latter, but not the former, inquiry.* (Emphasis in original).

*Id.* at 311–312.

The *Rempa* court added:

Moreover, security agreements represent consensual liens created by agreement of the parties. The fundamental requirement of a meeting of the minds is inherent in such agreements, as it is in all contracts. "Without a contract there can be no security interest." *In re Metzler* (N.D.Ala.1975), 405 F.Supp. 622, 625.

*Therefore the terms of the underlying contract are not foreclosed to inquiry by the mere appearance of a security agreement.* Extrinsic evidence is admissible under the U.C.C. to aid the trier of fact in its task of ascertaining the intent of the parties.

*Id.* at 312. (Emphasis added).

 It is an axiom of contract law that in order to have a binding agreement there must be a meeting of minds. In the commercial arena this question, the question of mutuality, is resolved by objective standards according to the manifestation (usually by words) of the parties intention. *Indiana Bell Telephone Co., Inc. v. Mygrant*, 441 N.E.2d 481 (Ind.App.3d Dist. 1983), *citing, Rutter v. Excel Industries, Inc.*, 438 N.E.2d 1030 (Ind.App.1982), and 17 Am.Jur.2d, *Contracts*, § 19.

This being a commercial transaction, the Court need only examine the language within the four corners of the agreement to determine whether as a matter of law the language contained therein constitutes a security agreement that meets the statute of fraud requirements of the Indiana UCC. The Court as a matter of law, finds the language contained in the June 11, 1982 agreement to be clear and unambiguous, and no parol evidence may be admitted to alter, or modify the same.

 This Court agrees with those cases that adopt the majority view that in order for a security agreement to be effective it must contain language which specifically creates or grants a security interest in the collateral, but no express words of grant, or "magic words" are necessitated to make a security agreement effective to transfer a security interest to a party, so long as the minimum statutory requirements are met. There must be language in the instrument which leads to the logical conclusion that it was the intention of the parties that a security interest be created. *Mitchell v. Shepherd Mall State Bank*, 458 F.2d 700, 10 U.C.C.Rep. 737, 740–741 and n. 2 (10th Cir.1972). A basic principle of Article 9 of the U.C.C. is that only a minimum of formality is needed to create a security interest. *Peterson v. Ziegler*, 39 Ill.App.3d 379, 350 N.E.2d 356, 19 U.C.C.Rep. 1210 (Ill.1976).

 A separate formal document entitled a "security agreement" is not always necessary to satisfy the signed-writing requirement of § 9–203(1)(b). A writing or writings, regardless of the label, which adequately describes the collateral, carries the signature of the Debtor, and establishes that in fact a security interest was agreed upon, would satisfy both the formal requirements of the statute and the policies behind it. *In re Numeric Corp.*, 485 F.2d 1328, 13 U.C.C.Rep. 416 (1st Cir.1973); *Personal Jet v. Callihan*, 624 F.2d 562, 29 U.C.C.Rep. 1012 (5th Cir.1980); *In re Boward Auto Brokers, Inc.*, 11 U.C.C.Rep. 402 (D.C.S.D.Fla., Ref.1972); *In re Frace*, 17 B.R. 198, (Bankr.D.Me.1982).

 Whether as noted in *Rempa v. LaPorte Production Credit Assn., supra*, the agreement satisfies the *threshold statute of frauds* requirement as presently found

in § 9–203(1)(b) is a *question of law* for the court. The factual issue of whether there was a meeting of minds as to whether there was an *underlying contractual intent* to create a security agreement is a *question of fact.*

The Court finds that as a matter of law, the Agreement satisfies the Indiana UCC statute of frauds as to the requirements of an enforceable security agreement between the co-plaintiff Miller individually and the Defendant. Although not artfully drawn, the clear and unambiguous intention of the parties was that the stock would serve to secure the obligations of CLM to the Plaintiff Miller. In addition, the record is devoid of any factual allegations of coercion, fraud, duress, undue influence, mistake, or lack of competency between the parties in the *initial* formation of the underlying contractual Agreement itself that would permit parol evidence to be adduced to prove there was a lack of mutual intent or reality of assent by the parties to create a security agreement.

▮▮▮ The agreement relating to the retransfer of the CLM stock by the Defendant to the Plaintiff Miller does not purport to secure an actual pecuniary indebtedness by the Defendant to the Plaintiff Miller, but only to secure that *CLM* will perform as to a certain obligation by it to the banking institutions that the Plaintiff Miller may have personally guaranteed. Pursuant to I.C. 26–1–9–204 extant at the time of the agreement, and thus applicable hereto "value" must be given for a security agreement to attach.[3] "Value" is defined at I.C. 26–1–1–201(44) as including, among other things, "generally in return for any consideration sufficient to support a simple contract." This definition is the same under the previous version of the Indiana UCC applicable to this agreement. Value was thus given by Plaintiff Miller to support the agreement as he transferred the 75 shares of CLM to the Defendant. The fact that the agreement to reconvey the stock by the Defendant to CLM was not based on

a direct promise by the Defendant to pay money, but on the performance of CLM does not alter the fact that value was given by the Plaintiff. The ultimate effect of clause five was for the Defendant to pledge his CLM stock to secure CLM's performance as to the payment of certain debts by it to the banking institution in question. Indiana Code 26–1–9–105(1)(d) provides that where the Debtor and the owner of the collateral are not the same person, the term "Debtor" means the owner of the collateral in any provision of I.C. 26–1 dealing with the collateral. Thus, even though CLM rather than the Defendant had the obligation to perform under the Agreement, and the Plaintiff Miller was a contingent creditor of CLM, the UCC authorized the Defendant as owner of the collateral, i.e. the CLM stock as someone other than the Debtor to secure this obligation of CLM. *See, e.g., Bank of Aspen v. Fox Cartage, Inc.,* 158 Ill.App.3d 939, 110 Ill. Dec. 914, 511 N.E.2d 1234, 4 U.C.C.Rep. Serv.2d 1591 (1987); *Pureen Bank & Trust Co., v. Gilbert,* 32 U.C.C.Rep.Serv. 1212 (N.D.Ill.1979). The Plaintiff Miller is only a contingent creditor of CLM, i.e. he would have a subrogation claim over versus CLM upon default by CLM of its obligation to CSB upon payment of his guaranty thereof. *See* 28 Am.Jur.2d § 127, *Guaranty.* In addition, he is a co-obligor (co-guarantor) with the Defendant on the institutional debt, whereby he is a contingent creditor, and has the right to contribution from the Defendant upon payment more than his ratable share of any such debt of CLM. *See,* 28 Am.Jur.2d § 128, *Guaranty. See also,* I.C. 26–1–9–112, and I.C. 26–1–9–105(1)(m) (previous "(1)(i)") defining "secured party".

▮▮▮ Section 523(a) speaks in terms of exceptions to discharge of a "debt", which is defined at § 101(12) as a "liability on a claim". A "claim" is defined at § 101(4)(A) as meaning, among other things, "right to payment, ... whether or not such right is

---

**3.** This Section was amended effective January 1, 1986 by P.L. 93–1985, sec. 14, which rewrote this section and transferred the relevant provisions to I.C. 26–1–9–203. *See also,* Comments to I.C. 26–1–1–105.

... contingent, ...;". Thus, a debt that is contingent may be nondischargeable.

 It is also noted that the Plaintiff did not take physical possession of the "instrument" as defined in I.C. 26–1–9–105(1) which includes stock. This is necessary to *perfect* a security interest in stock except for certain situations not applicable here. I.C. 26–1–9–304(1). However, the issue is *not perfection* of the Plaintiff's security agreement, and the Plaintiffs' priorities versus third parties, but the validity of the underlying security agreement *inter se.* The *validity* of a security agreement is not dependent on perfection. *Branch v. Steph*, 389 F.2d 233, 5 U.C.C.Rep. 23 (10th Cir. 1968); *Anderson v. First Jacksonville Bank*, 243 Ark. 977, 423 S.W.2d 273, 4 U.C.C.Rep. 1071 (Ark.1968); *First Galesburg Nat. Bank v. Martin*, 58 Ill.App.3d 113, 15 Ill.Dec. 603, 373 N.E.2d 1075, 23 U.C.C.Rep. 1328 (Ill.1978); *Security Bank of Oregon v. Levins*, 257 Or. 630, 480 P.2d 706, 8 U.C.C.Rep. 977 (Ore.1971).

 The Indiana Courts have not appeared to have ruled on the issue, but as a general proposition, it has been held that a pledgee is a "shareholder" for the purposes of a derivative action pursuant to Fed.R. Civ.P. 23.1. It is stated at 19 Am.Jur.2d *Corporations* § 2343 as follows:

A pledgee of corporate stock has such an interest therein as entitles him to be heard in a court of equity concerning the preservation and protection of the assets and property of the corporation. His rights in this respect are essentially the same as those of the owner of stock, for a loss of corporate assets must result in a depreciation of the value of the stock and a consequent impairment of his security. (Footnotes omitted).

When there are no reported Indiana decisions on the issue in controversy, or the

Court is faced with state law issue that is unsettled, the Federal Court must look to all available data and adopt a rule which it believes the Indiana Supreme Court would adopt. *Heinheld v. Bishop Motor Exp., Inc.*, 660 F.Supp. 382 (N.D.Ind.1987); *Neofes v. Robertshaw Controls Co.*, 409 F.Supp. 1376 (S.D.Ind.1976). In making such a decision without a discernible doctrinal trend, the Court may reasonably assume that the state court will follow the rule that appears best to effectuate the policies that under lie the rule, *Bowen v. U.S.*, 570 F.2d 1311 (7th Cir.1978).

However, it must be remembered that whether the debtor's obligation is nondischargeable pursuant to 11 U.S.C. § 523(a) remains a *federal* question of substantive law, and this court need only look to state law for guidance on that issue.

The Court concludes that the Indiana Courts in ruling on the issue would hold that a pledgee of stock is a "stockholder" for the purposes of Fed.R.Civ.P. 23.1 Am. Jur.2d, *Corporations*, § 2343 *supra.*

Because the Court has found that the Agreement is unambiguous and satisfies the statute of fraud requirements of I.C. 26–1–9–204 as constituted at the time the Agreement was entered into, and no factual issue has been raised by the parties as to a lack of intent by the parties to enter a valid underlying agreement to create a security interest, the court concludes that the Plaintiff Miller had a security interest in the CLM stock, and thus has the status of a "shareholder" for the purposes of Fed.R. Civ.P. 23.1, and therefore has the requisite standing to bring a derivative action versus the Defendant on behalf of CLM as a co-plaintiff with the Plaintiff Miller.[4]

 It is also proper to join a shareholder's primary claim with a derivative claim even though the two claims are some-

---

**4.** Indiana enacted the Indiana Bus. Corporation Law, I.C. 23–1–17–1 through I.C. 23–1–54.3, P.L. 149–1986, effective August 1, 1987, and repealed the Indiana General Corporation Act on the same date. Indiana Code 23–1–32–5 defines "shareholder" for the purposes of a derivative suit: "shareholder" includes a beneficial owner whose shares are held in a voting trust or held by a nominee on the owner's behalf."

Indiana Code 23–1–32–1, effective August 1, 1987, provides that a person may not commence a proceeding in the right of domestic or foreign corporations unless the person was a shareholder of the corporation when the transactions commenced or occurred, or unless the person became a shareholder through transfer by operation of law from one who was a shareholder at the time. *See also*, Ind.Tr.R. 23.1.

what antagonistic to each other, unless the conflict goes to the very heart of the subject matter of the litigation. 19 Am.Jur.2d, *Corporations,* § 2424.

The Court will next address the various provisions of § 523 under which the Plaintiffs allege that the debt in issue is nondischargeable both as to the primary claim of the co-plaintiff Miller personally, and as to the co-plaintiff Miller derivatively on behalf of CLM.

*Section § 523(a)(4):*

*Fraud or Defalcation while acting in a fiduciary capacity (rhetorical paragraphs 46 through 53 of amended complaint).*

The assertion of nondischargeability by CLM through the co-Plaintiff Miller in his derivative capacity pursuant to § 523(a)(4) is founded upon the alleged violation by the Defendant of certain Indiana corporation statutes.

Indiana Code 23–1–10–2(c) and (d) upon which the Plaintiffs rely provides as follows:

Sec. 2. In addition to any other liabilities a director shall be liable in the following circumstances unless he complies with the standard provided in this article for the performance of the duties of directors:

\* \* \* \* \* \*

(c) A director who votes for or assents *to any distribution of assets of a corporation to its shareholders during the liquidation of the corporation without the payment and discharge of, or making adequate provision for, all known debts, obligations, and liabilities of the corporation shall be liable to the corporation,* jointly and severally with all other directors so voting or assenting, for the value of such assets which are dis-tributed, to *the extent that such debts,* obligations and labilities *of the corporation are not thereafter paid and discharged.*

(d) A director who votes for or assents to the *declaration of any dividend or other distribution of the assets of a corporation to its shareholders* contrary to the provisions of this article or contrary to any restrictions contained in the articles of incorporation *shall* be *liable to the corporation,* jointly and severally with all other directors so voting or assenting, *for the amount of such dividend which is paid or the value of such assets which are distributed in excess of the amount of such dividend or distribution which could have been paid or distributed without a violation* of the provisions of this article or the restrictions in the articles of incorporation. (Emphasis added).[5]

It should be carefully noted that the foregoing statutory provisions create a liability in the Director to the *corporation* upon violation thereof by the Director, and *not* in the individual *stockholders* of the corporation or the pledgees of the corporate stock.

In addition, the Plaintiffs rely on I.C. 23–1–2–15(f)(1) which provides as follows:

(f) The board of directors of a corporation may, from time to time, distribute to its shareholders out of capital surplus of the corporation a portion of its assets, in cash or property, subject to the following provisions:

(1) No such distribution shall be made at a time when the corporation is insolvent or when such distribution would render the corporation insolvent.[6]

The theory of liability under § 523(a)(4) is thus not that the Agreement itself between the co-Plaintiff Miller personally, and the Defendant, created a fiduciary rela-

---

**5.** These sections were repealed by P.L. 149–1986, Sec. 65. Section 69(b) thereof provided that Section 65 of the Act takes effect August 1, 1987, or after the transaction complained of in this adversary proceeding. *See,* historical notes to I.C. 23–1–17–1. Repeal does not affect any actions taken prior to repeal.

**6.** This section was repealed by P.L. 149–1986, Sec. 65 Pursuant to Section 69(5). Section 65 takes effect August 1, 1987, or after the dates of the transactions complained of in this adversary proceeding. *See,* historical note to I.C. 23–1–17–1. Repeal does not affect any action taken prior to repeal.

tionship, but that I.C. 23–1–10–2(c) and (d), and I.C. 23–1–2–15 created a statutory fiduciary relationship between the Defendant, and either CLM or the co-Plaintiff Miller personally rendering the contingent debt to CSB by CMA which the Plaintiff Miller guaranteed nondischargeable.

■ It is clear based upon an examination of the *Agreement* that the terms of the Agreement itself between the co-Plaintiff Miller in his personal capacity, as contingent creditor of the Debtor and CLM, · and as a secured party, and the Defendant *personally,* and not as a director, did not create a fiduciary relationship between those two parties for the purposes of § 523(a)(4) by the mere existence of the Security Agreement created therein.

■ It is also clear from the pleadings and the record, that the co-Plaintiff Miller, in his personal capacity, is not a non-contingent creditor of CLM or the Defendant, but merely a contingent creditor, not as a result of the Agreement itself, but based on the separate personal guaranties of the co-Plaintiff Miller and the Defendant of the CLM debt to CSB.

■ The Court must also determine however, for the purposes of § 523(a)(4), whether Indiana Common Law or I.C. 23–1–10–2(c) and (d) and I.C. 23–1–2–15 created a fiduciary relationship between the Defendant as director, officer, and controlling stockholder of CLM, and the Plaintiff Miller as a contingent creditor of CLM, and a pledgee of CLM stock in his personal capacity, or between CLM and the Defendant. It must be remembered that the co-Plaintiff Miller is a secured party of the Defendant, secured by the stock in CLM, and he is not a party secured by underlying corporate assets of CLM.

The Court in *In re Holman,* 42 B.R. 848 (Bankr.E.D.Mo.1984) laid out some of the background necessary to resolve the issue of fiduciary status under § 523(a)(4). There the Court stated:

> [t]he old United States Supreme Court case of *Chapman v. Forsyth,* 2 How. 202, 43 U.S. 202, 11 L.Ed. 236 (1844). In that case, the Supreme Court first clari-

fied the meaning of the term "fiduciary" as used in a bankruptcy statute similar to section 523(a)(4):

> The second point is, whether a factor, who retains the money of his principal, is a fiduciary debtor within the act. If the act embrace such a debt, it will be difficult to limit its application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the first section of the act. The cases enumerated, "the defalcation of a public officer," "executor," "administrator," "guardian," or "trustee," are not cases of implied but special trusts, and the "other fiduciary capacity" mentioned, must mean the same class of trusts. The act speaks of technical trusts, and not those which the law implies from the contract. A factor is not, therefore within the act. This view is strengthened and, indeed, made conclusive by the provision of the fourth section, which declares that no "merchant, banker, factor, broker, underwriter, or marine insurer," shall be entitled to a discharge, "who has not kept proper books of accounts." In answer to the second question, then, we say, that a factor who owes his principal money received on the sale of his goods, is not a fiduciary debtor within the meaning of the act.

*Chapman v. Forsyth, supra* 2 How. at p. 207.

This interpretation was later approved by the Supreme Court in *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). Clearly then, the term "fiduciary" as used in 11 U.S.C. 523(a)(4) is limited to the class of fiduciaries including trustees of specific writ-

ten declarations of trust, guardians, administrators, executors, or public officers and, absent special considerations, does not extend to the more general class of fiduciaries such as agents, bailees, brokers, factors, and partners. Thus, the alleged indebtedness at issue in this case is not a debt for fraud or defalcation while acting in a fiduciary capacity.

*Id.* at 851.

The Court is also referred to the case of *In re Nivan,* 32 B.R. 354 (Bankr.W.D.Okla.1983), which correctly stated as follows:

The fiduciary relationship referred to in § 523(a)(4) has been held to be limited to express and technical trusts. *Davis v. Aetna Acceptance Co., supra* [293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934)]; *In re Romero, supra* [535 F.2d 618 (10th Cir.1976)]; *In re Cairone,* 12 B.R. 60 (Bkrtcy.D.R.I.1981). Further, it has been held the trust may not be one arising or implied from a contract. *In re Romero, supra. Cf. Davis v. Aetna, supra; In re Paley,* 8 B.R. 466 (Bkrtcy.E.D.N.Y.1981) (it is not enough that the trust relationship spring from the act from which the debt arose). The fact that a commercial agreement contains the word "trust", however, does not make the agreement a trust agreement. *Davis v. Aetna Acceptance Co., supra; In re Paley, supra.* "in [sic] the absence of a true fiduciary or trust relationship, a plaintiff may not circumvent the effect of a bankruptcy discharge by adding 'trust language' to an ordinary commercial agreement." *In re Paley, supra,* at 469.

The question of who is a fiduciary for purpose of § 523(a)(4) is one of federal law. *Matter of Angelle,* 610 F.2d 1335 (5th Cir.1980). However, state law plays an important role in determining whether a specific case involves an express trust. *Matter of Angelle, supra; In re Cairone, supra. Cf. Jaffke v. Dunham,* 352 U.S. 280, 77 S.Ct. 307, 1 L.Ed.2d 314 (1957) (determination of whether trust established in bankruptcy proceeding un-

der § 70(a)(4), 11 U.S.C. § 110(a)(4), is one of state law).

*Id.* at 355–357.

The Court's attention is also directed to the case of *In re McCraney,* 63 B.R. 64 (Bankr.N.D.Ala.1986), where the Court in discussing the law to be applied in determining nondischargeability under § 523(a)(4) stated as follows:

All questions of dischargeability of debts in bankruptcy proceedings are federal law questions. *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). Less clear is whether federal law or state law determines the underlying issues of a dischargeability issue under Section 523(a)(4).

The Supreme Court appeared to answer this question in *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), by applying state law, some Courts of Appeal circumvent *Davis* and apply state law directly, but the majority of them apply *Davis* in connection with a non *Davis* federal standards analysis of state law.

The Eleventh Circuit sides with the majority. *Matter of Cross,* 666 F.2d 873 (5th Cir.1982) (Unit B). *Cross* relies on *Matter of Angelle,* 610 F.2d 1335 (5th Cir.1980), which explains why both state and federal law should be consulted. "We think it essential to clarify the precise role of state law.... To begin with, the scope of the concept fiduciary under Section 17(a)(4) is a question of federal law." *Id.* 1341. "On the other hand, state law takes on importance in determining when a trust exists." *Id.* "We also believe that state law may play importance in determining whether a specific case involves an express trust." *Id.* Footnote omitted.

Under *Davis v. Aetna* and its progeny, a fiduciary relationship exists for purposes of the Bankruptcy Code if there is a technical trust, not one which the law implies from a contract, *Chapman v. Forsyth,* 2 How. 189, 195, 11 L.Ed. 236 (1844); and it must have existed prior to the act creating the debt and without reference to that act. *Upshur v. Briscoe,* 138 U.S. 365, 378, 11 S.Ct. 313, 317–

18, 34 L.Ed. 931 (1890); and *Davis v. Aetna,* 293 U.S. 328, 333, 55 S.Ct. 151, 153–54, 79 L.Ed. 393 (1934).

Under *Cross* and the majority procedure, where state statutes impose fiduciary trusts, additional factors are considered. Does the statute require the individual to maintain a segregated account? *See Matter of Angelle,* 610 F.2d 1335, 1340 (5th Cir.1980); *Matter of Cross,* 666 F.2d 873, 881 (5th Cir.1982) (Unit B); *Matter of Banister,* 737 F.2d 225, 229 (2nd Cir.1984), *cert. denied,* 469 U.S. 1035, 105 S.Ct. 509, 83 L.Ed.2d 400 (1984); *In re Katzen,* 47 B.R. 738 (Bkrtcy.D.Mass.1985). Does the statute create the basic elements of a trust? Is a *res* defined? Are fiduciary duties spelled out? *In re Pedrazzini,* 644 F.2d 756, 759 (9th Cir.1981); and *In re Lipke,* 54 B.R. 704 (Bkrtcy.W.D.Wis.1985).

*Id.* at 65–66 (Footnotes omitted).

It is noted that the Seventh Circuit in the case of *Matter of Thomas,* 729 F.2d 502, (7th Cir.1984) applied federal standards to a Wisconsin statute without applying *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, *supra.*

■ It is thus true that although constructive or implied trusts are specifically excluded from the definition of a fiduciary under bankruptcy law, statutory trusts may be found to establish a fiduciary status if the necessary elements are found.

As stated in *In re Pedrazzini,* 644 F.2d 756 (9th Cir.1981), the precise manner of the creation of the trust, by consent or by a statute, is of little importance. "Rather the focus should be on whether true fiduciary responsibilities have been imposed." *Id.* at 758, n. 2.

■ The elements necessary to create an express or "technical" trust include 1) sufficient words to create a trust, 2) a clearly defined trust *res,* and 3) an intent to create a trust relationship. *In re Kelley,* 84 B.R. 225 (Bankr.M.D.Fla.1988). It has also been held that a statute which makes the act of misappropriating funds a crime, without requiring those funds to be segre-

gated at the out set is insufficient to create a trust for the purposes of § 523(a)(4). *Id.* at 230. However, the Seventh Circuit in the case of *Matter of Thomas,* 729 F.2d 502, *supra,* in considering a Wisconsin "theft by contractors" statute which provided that all moneys, bonds or warrants paid or to become due to any prime contractor or subcontractor for public improvements are a trust fund only in the hands of a prime contractor or subcontractor, and the use of those moneys for any purpose other than payment of claims on a public improvement before the claims have been satisfied constituted theft constitutes a fiduciary relationship pursuant to 11 U.S.C. § 523(a)(4). In *Thomas,* the plaintiff was the prime contractor on a construction project. The defendants entered into a contract with the plaintiff to do the landscaping for the project. The plaintiff alleged it paid the defendants $21,530.00 for the landscaping which they allegedly held in trust per the above statute and the defendants used the monies for other purposes requiring the plaintiffs to complete the landscaping project at an additional cost. The Court held that under trust law the debtors' obligation to the plaintiff was nondischargeable in the amount of the trust funds diverted by them. The Court cited *In re Carey Lumber,* 615 F.2d 370 at 374 (5th Cir.1980) with approval which construed a similar Oklahoma lien trust as an express trust and not a trust *ex maleficio,* in that the statute clearly defined the trust *res,* and charged the trustee with affirmative duties in applying the trust funds. The *Carey* court noted that, while lacking a trust agreement executed by the parties, the Oklahoma lien trust statute was an express trust that effected a fiduciary relationship; that the trust relationship was established upon receipt of the funds, and that the funds are to be held in trust even though there may be no beneficiary at the time they are received. *Cf. In re Boyle,* 819 F.2d 583, (5th Cir.1987), where the court held that the Texas Trust Code and its imposition of fiduciary duties on trustees did not apply to statutory construction trust funds where the construction trustee is under no obligation to segregate funds

or to apply proceeds from each specific job only to the expenses of that job, and criminal penalties are imposed only if the trustee diverted from creditors with intent to defraud.

■ It is clear upon analysis of I.C. 23-1-10-2(c) and (d) that these provisions are not applicable to the Defendant vis á vis the co-Plaintiff Miller personally, as the duties and liabilities imposed by those subsections flow to the *corporation* and does not vest a right to pursue a director in either a creditor or a stockholder of the corporation in his individual capacity. Thus, any violation of these subsections would not render any indebtedness of the Defendant to the Plaintiff as a contingent creditor of the corporation, and of the Defendant by virtue of their co-guaranty of the CLM debt, nondischargeable pursuant to § 523(a)(4). There remains however, the issue of whether the Defendant's conduct may have created a nondischargeable debt to CLM pursuant to § 523(a)(4) which the co-Plaintiff may enforce by a derivative action.

■ It has been held in Indiana that a "fiduciary relationship" exists between officers of a private corporation and the corporation, and general "public policy" prevents an officer from deriving a benefit to himself or working a wrong to another through the relationship. *First Merchants' National Bank & Trust Co. of Lafayette v. Murdock Realty Co.,* 111 Ind. App. 226, 39 N.E.2d 507 (Ind.App.1942); *Schemmel v. Hill,* 91 Ind.App. 373, 169 N.E. 678 (Ind.App.1930); *Yerke v. Batman,* 176 Ind.App. 672, 376 N.E.2d 1211 (Ind.App.1978) (concerning matters affecting general well-being of corporation officers and directors are fiduciary to corporation and to its shareholders); *Epperly v. E & P. Brake Bonding, Inc.,* 169 Ind.App. 224, 348 N.E.2d 75 (Ind.App.1976) (officer or director stands in a fiduciary relationship to his corporation); *Tower Recreation v. Beard,* 141 Ind.App. 649, 231 N.E.2d 154 (Ind.App.1967). This is in line with the majority rule in most jurisdictions. In addition, in Indiana, the shareholders of a close corporations, also referred to as an "incorporated partnership" stand in a fidu-ciary relationship to every other. *Hartung v. Architects Hartung/Odle/Burke, Inc., et. al.,* 157 Ind.App. 546, 301 N.E.2d 240 (Ind.App. 1st Dist.1973); *Ross v. Tavel,* 418 N.E.2d 297 (Ind.App. 1st Dist.1981); *Cressy v. Shannon Continental Corporation,* 177 Ind.App. 224, 378 N.E.2d 941 (Ind.App. 3rd Dist.1978). *See* 18A Am.Jur.2d *Corporations* § 764 (Controlling or Dominant Stockholders), and 18B Am.Jur.2d *Corporations* § 1689 (Officers and Directors).

It is also noted that, an Indiana Court did hold in the case of *City National Bank v. Goshen Woolen Mills Co.,* 35 Ind.App. 562, 69 N.E. 206, *trans.,* 163 Ind. 214, 71 N.E. 652 (Ind.App.1904), that while directors of a going corporation are trustees primarily of stockholders who are the real parties in interest, directors of an insolvent corporation hold assets in trust for creditors, who have exclusive interest for the payment of debts either pro rata or preferentially.

However, as stated previously, although this Court may look to state law for guidance, the resolution of the ultimate question of whether the defendant as a director and controlling stockholder is a fiduciary pursuant to § 523(a)(4) is a matter of federal law. *Matter of Angelle,* 610 F.2d 1335 (5th Cir.1980).

In addition, statutory exceptions to discharge are to be narrowly construed in order to effectuate the congressional policy of permitting bankrupts a fresh start. *In re Kimzey,* 761 F.2d 421, 424 (7th Cir.1985).

Although the United States Supreme Court was deciding the issue of equitable subordination, rather than the nondischargeability of a debt in the case of *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), it set out the following general principles regarding the status and duties of a director, or a dominant or controlling stockholder or group of stockholders of a corporation to the corporation as follows:

A director is a fiduciary. *Twin–Lick Oil Co. v. Marbury,* 91 U.S. 587, 588 [23 L.Ed. 328]. So is a dominant or controlling stockholder or group of stockholders. *Southern Pacific Co. v. Bogert,* 250 U.S. 483, 492 [39 S.Ct. 533, 537, 63

L.Ed. 1099]. Their powers are powers in trust. *See Jackson v. Ludeling,* 21 [U.S. (Wall.)] Wall. 616, 624 [22 L.Ed. 492]. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. *Geddes v. Anaconda Copper Mining Co.,* 254 U.S. 590, 599 [41 S.Ct. 209, 212, 65 L.Ed. 425]. The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside. While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee. For that standard of fiduciary obligation is designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders. *Id.* 308 U.S. at 306–307, 60 S.Ct. at 245.

Thus, the Federal Rule as to a director's or a dominant or controlling stockholder's duties as fiduciary to a corporation does extend to individual creditors of the corporation in the case where equitable subordination of a claim of a director or stockholder versus the corporation is applicable as in *Pepper v. Litton, supra.*

In *Gochenour v. George and Francis Ball Foundation,* 35 F.Supp. 508, 515 (S.D. Ind.1940), *aff'd.* 117 F.2d 259, *cert. denied,* 313 U.S. 566, 61 S.Ct. 942, 85 L.Ed. 1525 it was held that a director of a corporation, though not a "trustee" in a strict sense, for the reason that he has not title to the estate, is a "fiduciary" because he and his fellow directors have control of the corporate property, and upon violating his fiduciary obligations, the director comes under the same obligation to his company that any agent is under who is faithless to his trust, and if a corporation becomes insolvent its claim against the director passes to its liquidator, along with its other assets.

It was also held in *Gochenour* that a cause of action to receive losses through mismanagement and negligence of corporate officers and directors of a corporation is an "asset" of the corporation, or of the trustee, or of the receiver thereof, and can be maintained only in the right of the corporation for the benefit of all persons entitled to participate in the distribution of its assets, and, as there can be one claim, it follows that only the liquidator may sue the faithless directors. The cause of action being in the liquidator, no creditor may sue the directors, either for himself alone or in a class suit. *Id.*

The Court in *In re Long,* 774 F.2d 875, 878 & n. 3, (8th Cir.1985), recognized that a state statute or state rule of law may create a fiduciary status in an officer which is cognizable in a bankruptcy proceeding, *citing, In re Interstate Agency, Inc.,* 760 F.2d 121 (6th Cir.1985), and *Matter of Whitlock,* 449 F.Supp. 1383 (W.D.Mo.1978). The *Long* court also noted the case of *John P. Maguire Co. v. Herzog,* 421 F.2d 419 (5th Cir.1970), where it was held that draining off a corporation's assets for the benefit of an officer may create a bar to discharge, but the *Long* court declined to make officers fiduciaries with respect to third party creditors.

In *In re Overmeyer,* 52 B.R. 111 (Bankr. S.D.N.Y.1985), the Court stated as follows:

The liability of corporate officers and directors *to the corporation* is not dischargeable when bottomed on fiduciary fraud. *See, e.g., John P. Maguire & Co. v. Herzog,* 421 F.2d 419, 421 (5th Cir. 1970); *In re Hammond,* 98 F.2d 703, 705 (2d Cir.), *cert. denied,* 305 U.S. 646, 59 S.Ct. 149, 83 L.Ed. 418 (1938); *In re Bernard,* 87 F.2d 705, 707 (2d Cir.1937); *Black's, Inc., v. Decker (In re Decker),* 36 B.R. 452, 457 (D.N.D.1983); 1 W. Norton, Bankruptcy Law and Practice § 27.50 (1981). (Emphasis added).

*Id.* at 118.

However, the *Overmeyer* court went on to state:

The fact that FNBB was a secured creditor of TOC and Telecasting, without more,

does not establish a fiduciary duty owed to the creditor by the officers in control of the obligor corporation. Such officers owe a fiduciary duty to their corporation and the shareholders, *but not to the creditors* of the corporation. *Murphy & Robinson Investment Co. v. Cross (In re Cross)*, 666 F.2d 873, 880 (5th Cir.1982); *Ealy Campbell Mobile Homes, Inc. v. Whitlock (In re Whitlock)*, 449 F.Supp. 1383, 1388 (W.D. Mo.1978); *Kelley v. Conwed Corp.*, 429 F.Supp. 969, 971–72 (E.D.Va.1977). (Emphasis added).

*Id.* at 121.

In *In re Black*, 787 F.2d 503 (10th Cir. 1986), the Court held that under applicable state law, which followed the general rule, a corporate officer owed a fiduciary duty to the corporation, and its shareholders; however, this duty is owed to the shareholders *collectively,* and no fiduciary duty is owed to the stockholders individually and directors generally do not occupy a fiduciary position with respect to stockholders in face to face transactions, *citing, St. Louis Union Trust Co. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 562 F.2d 1040, 1055 (8th Cir.1977), *cert. denied*, 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978).

In *In re Clark*, 65 B.R. 306 (Bankr.D. Conn.1986), the Court found that no fiduciary relationship existed between the officers and a creditor of a corporation as would render the officers guarantee obligations nondischargeable under § 523(a)(4) for false statements made in connection therewith. The Court noted the settled rule that, as used in § 523(a)(4), a fiduciary relationship must have existed *before* the wrongful act that gave rise to the contested debt rather than be imposed as a consequence thereof, and that it is not enough that by the very act of wrongdoing out of which the contested debt arose, the bankrupt has been charged as a trustee *ex maleficio*. The Debtor must have been a trustee before the wrong and without reference thereto. *Compare, In re Byrd*, 51 B.R. 649 (Bankr.S.D.Ohio 1985). Plaintiff *corporation* stated a claim for fraud or defalcation by a debtor, its former manager, while acting in a fiduciary capacity.

In *Kelley v. Conwed Corporation*, 429 F.Supp. 969 (E.D.Va.1977), the Court cited *Pepper v. Litton* for the proposition that an individual creditor may not assert a claim against corporate officers under 11 U.S.C. § 35(a)(4) as constituted under the previous Bankruptcy Act, (now § 523(a)(4)). In *Kelley v. Conwed Corp.*, the Debtor had paid himself funds from the corporate account just prior to the firms insolvency, and further caused the insolvent corporation to transfer funds to a solvent corporation controlled by the Defendant. The Court held:

> Once bankruptcy is begun and the assets of the corporation are controlled by a court of equity, the interests of corporate creditors are protected by the trustee. Plaintiff has cited no authority for the proposition that an individual creditor may recover against a corporate officer for a general misappropriation of corporate funds.
>
> There is no question but that the defendant's actions created a claim against him in the amount misappropriated by him on behalf of the corporation or its trustee. This does not mean the defendant is fully liable to each individual creditor who was left unpaid by the insolvency of Specialties.

*Id.* at 971.

Finally, the Court in *Matter of Cross*, 666 F.2d 873 (5th Cir.1982) in construing § 17(a)(4) of the previous Act (11 U.S.C. § 35(a)(4) (repealed)) stated as follows:

> For a debt to be nondischargeable under this section, the creditor must be among this protected class; an officer's unfaithfulness to or mismanagement of his corporation will not give rise to nondischargeable liability directly to individual creditors of the corporation. A contrary rule would be unduly burdensome on the bankrupt and inconsistent with the basic policies underlying the Act.
>
> \* \* \* \* \* \*
>
> Moreover, permitting a single corporate creditor to have his debt declared nondischargeable in the officer's individual bankruptcy could possibly interfere with the recovery sought by the corpora-

tion itself against the delinquent officer, and thus would be unfair to the corporation and other corporate creditors. The preferable approach would be to allow the corporation (or its trustee in bankruptcy) to assert a claim based on the defalcation that would inure to the benefit of all the corporation's creditors. *See In re Whitlock*, 449 F.Supp. 1383, 1388–89 (W.D.Mo.1978); *Kelley v. Conwed Corp.*, 429 F.Supp. 969, 971–73 (E.D.Va. 1977).

*Id.* at 880.

The essence of the foregoing cases, with which this Court is in accord, is that a mere corporate creditor is precluded from obtaining a judgment of nondischargeability versus a corporate director, officer or controlling stockholder for the misappropriation of corporate assets under § 523(a)(4).

In addition, it has been held, pursuant to Indiana law that allegations of improper manipulation of funds for wrongful diversion of corporate assets by a controlling shareholder creates a cause of action in the corporation rather than in favor of the minority shareholder as such actions are deemed to be a breach of the controlling shareholder's fiduciary duty which he owes to the corporation. *Ross v. Tavel*, 418 N.E.2d at 304, *supra.*

The Indiana Court of Appeals noted in *Moll v. South Central Solar Systems, Inc.*, 419 N.E.2d 154 (Ind.App. 1st Dist. 1981), that the well established rule is that shareholders of a corporation may not maintain actions at law in their own manes to redress an injury to the corporation even if the value of their stock is impaired as a result of the injury. The rationale supporting this rule being that authorization of shareholder acting in such cases would constitute authorization of multitudinous litigation and disregard of the corporate entity.

It is true, that under Indiana law, a personal cause of action in a stockholder may arise when there is a breach of duty owed specially to a stockholder separate and distinct from the duty owed the corporation. *See Sacks v. American Fletcher National Bank & Trust Co.*, 279 N.E.2d 807 (Ind.S.

Ct.1972), *citing Buschmann v. Professional Men's Association*, 405 F.2d 659 (7th Cir.1969), where it was noted that a personal guaranty can be the basis for a personal cause of action. However, in the case at bar, any breach of the agreement by the Defendant as an officer, director, or controlling stockholder of the Defendant that vested in the co-Plaintiff Miller personally was a contractual one arising solely out of the Agreement and was not the breach of a fiduciary duty as defined by § 523(a)(4). In addition, although the co-Plaintiff Miller was a "shareholder" for the purposes of bringing a derivative action on behalf of CLM pursuant to Fed.R.Civ.P. 23.1, he was not an actual shareholder, but merely a secured party vis á vis the Defendant.

Thus, the right to pursue any alleged wrong doing by the Defendant as an officer, director, or controlling stockholder of CLM relating to the assets of CLM was in CLM itself, and not *individually* in any person who was a stockholder or a creditor of CLM at the time of the alleged wrongful distribution.

In *In re Anzman*, 73 B.R. 156 (Bankr.D. Colo.1986), the court held that a Colorado statute regarding the liquidation of corporate assets did not impose a fiduciary obligation on the directors and officers of corporation as to its *creditors* (*cf.* stockholders) regarding monies received from such a liquidation. The Court noted:

> Not every state statute which imposes a duty imposes a "trust" relationship. the elements of a formal trust or the typical attributes of a trust must exist. *Ford Motor Credit Co. v. Talcott*, 29 B.R. 874, 878 (Bankr.D.Kan.1983). The general characteristics of an express trust are sufficient words to create a trust, a definite subject, a certain object or *res*, with intent to create the trust relationship being a key element. *In re Martin*, 35 B.R. 982, 985 (Bankr.E.D.Pa.1984). .... to extend the Bankruptcy Code's limited definitions of fiduciary to a situation where a state statute merely creates a civil liability would be contrary to the Code's intent.

*Id.* at 166–167.

Indiana Code 23–1–10–2(c) does not expressly designate that any money or prop-

erty wrongfully received by a corporate stockholder from the Board in wrongfully distributing corporate assets is a "trust fund" upon receipt thereof for unpaid creditors. No specific fiduciary duties are imposed upon the directors of a corporation pursuant to that statute to segregate any such money or property in trust for the exclusive benefit of unpaid creditors. It would thus be improper to extend the federal definition of a fiduciary under § 523(a)(4) as defined in the cases set out above based upon the above statute by expanding as a protected class to a creditor or shareholder in his individual capacity, when the statute merely creates a civil liability in the director to the corporation, for a violation thereof. Accordingly, no fiduciary duty existed between the Defendant pursuant to I.C. 23–1–10–2(c), as director of CLM, and the Plaintiff Miller, individually as a contingent creditor of CLM, or as a secured party of CLM stock, prior to the alleged creation of the civil liability by any alleged misappropriation of corporation assets of CLM by the Defendant as director. This section was, of course, intended to protect creditors of a corporation against wrongful distribution to stockholders, and may vest a cause of action in a creditor so as to reach assets paid by a corporation to a stockholder. *See, e.g. Grant T. Munson Chevrolet, Inc. v. General Motors Corp.*, 66 F.Supp. 714 (D.C.1946), and *Fricke v. Angemeier*, 53 Ind.App. 140, 101 N.E. 329 (Ind.1913); however, it did not create a federally defined, pre-existing express or technical fiduciary relationship to general creditors pursuant to § 523(a)(4) but one that is *ex maleficio.*

█ A creditor who asserts that a claim is nondischargeable pursuant to § 523(a)(4) must be among the class of persons sought to be protected, i.e. the fiduciary obligation must run to the claimant. *In re Good*, 33 B.R. 163, 166 (Bankr.M.D.Fla.1983). Here the class to be protected is CLM, and not the Plaintiff Miller individually.

It was noted in the case of *Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339 (7th Cir.1987) as follows:

It has also long been held that rights of action against officers, directors and shareholders of a corporation for breaches of fiduciary duties, which can be enforced by either the corporation directly or the shareholders derivatively before bankruptcy, become property of the estate which the trustee alone has the right to pursue after the filing of a bankruptcy petition. *Pepper v. Litton*, 308 U.S. 295, 306–07, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939); *Mitchell Excavators by Mitchell v. Mitchell*, 734 F.2d 129, 131 (2d Cir. 1984); *Bayliss v. Rood*, 424 F.2d 142, 146 (4th Cir.1970). The section 541 estate has been found to include any actions that a debtor corporation may have to recover damages for fiduciary misconduct, mismanagement or neglect of duty, and the bankruptcy trustee succeeds to that right for the benefit of all creditors of the estate. *Delgado Oil Co., Inc. v. Torres*, 785 F.2d 857, 860 (10th Cir.1986).

*Id.* at 1343–1344.

Thus, any claim for fiduciary breach clearly rests in CLM only.

Inasmuch, as the Plaintiff Miller was a contingent creditor of the Defendant, and a contingent creditor of CLM, as well as a pledgee of 75 shares of CLM stock at the time of the transactions complained of, no right to commence an adversary proceeding for breach of fiduciary duty pursuant to § 523(a)(4) lies in the Plaintiff Miller individually. However, CLM itself did have standing to pursue a § 523(a)(4) adversary proceeding versus the Defendant via the co-Plaintiff Miller in a derivative suit, inasmuch as the Defendant was clearly a fiduciary as to CLM.

█ It is judicially noted that the complaint by the Intervenor–Plaintiff CLM was filed on February 26, 1987, while the Debtor received his general discharge under § 727 on June 6, 1986, or prior to the filing of the intervenor's complaint.

The Defendant did not raise the affirmative defense of the statute of limitations (Fed.R.Civ.P. 8(c) as made applicable by Bankr.R. 7008) to the amended complaint (motion to intervene) by CLM. Nevertheless, the time had run for CLM to timely

object to the Defendant's discharge pursuant to § 523(c) as the last day to object was March 24, 1986 by to order of the Court on December 31, 1985, pursuant to Bankr.R. 4007(c). Thus, the amended complaint or motion to intervene of CLM was late filed. The time to file a nondischargeability complaint is absolute. *See In re Beckman,* (N.D.Indiana, case no. 87–40221, Sept. 29, 1987, Slip opinion., J. Lindquist). It should be noted that although the amended complaint of the co-Plaintiff Miller, individually, relates back to the date of the filing of the original complaint or March 24, 1986, and thus was timely filed, the "amended" complaint as to CLM was not an amendment at all, and thus not governed by Bankr.R. 7015 and Fed.R.Civ.P. 15, in that CLM was not a party to the original complaint. Thus, the amended complaint does not relate back to the date of the original pleading pursuant to Fed.R.Civ.P. 15(c) as to CLM. A Plaintiff who claims an independent cause of action cannot intervene in the original action after the statute of limitation has run. *See* 51 Am.Jur.2d § 263, *Limitations of Actions,* and cases cited therein. Clearly the nondischargeability complaint filed in the first instance by CLM in the amended complaint was an independent claim residing in CLM, and was thus not timely filed.

 Was the late filing by CLM waived by the failure of the Defendant to raise a statute of limitations defense in his answer? This Court believes not, and agrees with the conclusion of the court in *In re Kirsch,* 65 B.R. 297 (Bankr.N.D.Ill.1986), which held that the deadlines set by the Bankruptcy Rules are jurisdictional, and, thus, the Debtor's actions of answering the discharge complaint, and even going to trial without raising the timeliness issue did not waive the timeliness objection as to the dischargeability complaint as the deadlines fixed by the Bankruptcy Rules 4007(c) and 9006(b)(3) are jurisdictional, and cannot be waived. *See also, In re Tuzzolino,* 71 B.R. 231 (Bankr.N.D.N.Y.1986); *Burger King v. Burger King of Kansas, Inc., et. al.,* 73 B.R. 671 (D.Kan.1987); *In re Low,* 8 B.R. 716 (Bankr.D.R.I.1981) (application to intervene in adversary proceeding and objec-

tions to discharge held untimely under prior Bankruptcy Rule). *Contra, In re Meyers,* 60 B.R. 108 (Bankr.D.C.1986), and *In re Clay,* 64 B.R. 313 (Bankr.N.D.Ga.1986).

The amended complaint by the co-Plaintiff CLM as an intervenor after the bar date, and after the issuance of the general discharge is an unwarranted attempt to collaterally attack the general discharge granted to the Defendant, and shall not be permitted.

 Even if the Court were not to hold the issue of a late filed complaint to be jurisdictional, Fed.R.Civ.P. 24(a)(2) requires that, the motion to intervene must be "timely". Clearly, the motion to intervene (amended complaint filed February 26, 1987) by CLM was not timely when filed over eleven months after the bar date fixed to determine nondischargeability of debts.

Accordingly, the complaint of both the co-Plaintiffs Miller and CLM are dismissed as to any theory by which they have alleged that any obligation to either of them by the Defendant is nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

*11 U.S.C. § 523(A)(6); WILLFUL AND MALICIOUS INJURY BY DEFENDANT TO PROPERTY OF PLAINTIFF, AND 11 U.S.C. § 523(a)(2)(A).*

At rhetorical paragraphs 34 through 45, the co-Plaintiff Miller alleges that the Defendant's conduct in rendering CLM insolvent rendered the 75 shares of CLM that the Defendant pledged to the Plaintiff worthless and thus, the debt to the Plaintiff is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

At paragraphs 8 through 33, the Plaintiff alleges that the debt is nondischargeable based on fraud pursuant to 11 U.S.C. § 523(a)(2)(A) in that when the Agreement was entered into the promises made therein were false, and made with an intent to deceive, in that the Debtor wrongfully liquidated the assets of CLM to his own benefit thereafter.

 As to the § 523(a)(6) allegation, the Court will reiterate its holding in its Memorandum Opinion and Order of February 6,

1987. The co-Plaintiff Miller individually had no legal or equitable interest in the corporate assets of CLM. *See* 6 I.L.E. § 124, *Corporations;* 18 Am.Jur.2d §§ 749–750, *Corporations,* and cases cited therein. Nor was there any agreement as to the co-Plaintiff Miller by CLM or the Defendant not to sell those assets. The Plaintiff only had a security interest in the CLM stock and there is no allegation that the Defendant converted the CLM stock. It could well be that the transfer of the CLM assets was wrongful as to *CLM,* but any such transaction by the Defendant would not vest a nondischargeability action in any creditor, stockholder or pledgee of the stock of CLM, of CLM individually, such as the co-Plaintiff Miller pursuant to § 523(a)(6).

As stated above in the discussion of § 523(a)(4) regarding fiduciary liability, any assertion by CLM that the Defendant wrongfully converted the CLM assets would state a claim for relief versus the Defendant as to CLM only under § 523(a)(6), but that claim was not timely filed by CLM, and thus will not be considered.

■ The final issue is § 523(a)(2)(A). By alleging in his amended complaint that the Defendant fraudulently intended to not comply with the Agreement at the time it was entered into (Rhetorical Par. 31), the co-Plaintiff Miller individually has stated a claim for relief under § 523(a)(2)(A). Well-pled allegations of fact contained in the complaint, and every inference fairly deductible therefrom are accepted as true for the purposes of a motion to dismiss, including facts alleged on information and belief. *Carroll v. Morrison Hotel Corp.,* 149 F.2d 404 (7th Cir.1945). The basic test on a motion to dismiss is whether the complaint, with all the well-pled material facts taken as true and construed in the light most favorable to the Plaintiff, set forth facts sufficient to state a legal claim. *United States v. Geisler,* 174 F.2d 992 (7th Cir. 1949), *cert. den.,* 338 U.S. 861, 70 S.Ct. 103, 94 L.Ed. 528.

The accepted rule in appraising the sufficiency of a complaint is that it should not be dismissed for failure to state a claim unless it appears beyond a doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Zapp v. United Transp. Union,* 727 F.2d 617 (7th Cir.1984).

■ A mere breach of contract by the debtor without more, does not imply existence of actual fraud for purposes of the exception to discharge under Section (a)(2)(A). *In re Salett,* 53 B.R. 925, 928 (Bankr.D.Mass.1985); *In re Emery,* 52 B.R. 68, 70 (Bankr.E.D.Pa.1985). That is subsequent conduct contrary to a former representations does not render original representation to be false. *In re Boese,* 8 B.R. 660, 662 (Bankr.N.D.1981). However, if a debtor enters into a contract intending not to comply with its terms and later defaults under that contract, such contract may provide a basis for exceptions to discharge on the grounds of fraud *if the other remaining elements are satisfied. In re Taylor,* 49 B.R. 849, 851 (Bankr.E.D.Pa. 1985); *In re Fenninger,* 49 B.R. 307, 310 (Bankr.E.D.Pa.1985).

■ While as a general proposition the alleged fraud must exist at the inception of the debt, and statements or actions which were neither false nor fraudulent when made will not be made so by the happening of subsequent events, a promisors *subsequent conduct may reflect his state of mind at the time he made the promise* and thus be considered in determining whether he possessed the requisite fraudulent intent. *In re Kelsey,* 9 B.R. 154, 157 (Bankr.W.D.Ky.1981). Nevertheless, false representations or false statements encompass statements that falsely purport to depict *current or past facts* and do not relate to *future action. In re Todd,* 34 B.R. 633, 635 (Bankr.W.D.Ky.1983).

Accordingly, if the Plaintiff Miller can prove as alleged, that the Defendant fraudulently had no intent whatsoever to comply with the Agreement at the time it was entered into he may be able to obtain relief based on that claim. In addition, the Plaintiff's damages as a contingent creditor of the Defendant on the co-guaranty will be limited to the extent that he pays more

than his ratable share of his guaranty of the CLM debt covered by the Agreement. The Court thus sets this matter down for a pretrial conference on the 28 day of Sept., 1988 at 10:30 o'clock A.M. on the sole issue of whether this alleged debt by the Defendant to the Plaintiff Miller individually is nondischargeable pursuant to § 523(a)(2)(A). All other counts by both the co-Plaintiff Miller or the co-Plaintiff CLM are hereby DISMISSED on any theory proceeding under § 523(a)(4) or (6).

SO ORDERED.